IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23–cv–02772–GPG–MDB

THE ESTATE OF JAY PHILIP PRITCHARD, by and through its personal representative Nola Mawhinney,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF PUEBLO, COLORADO,
DAVID J. LUCERO, SHERIFF OF PUEBLO COUNTY, in his official capacity,
WELLINGTON DUPLESSIS, in his individual capacity,
ANDREW WARD, in his individual capacity,
NAPHCARE, INC., an Alabama corporation,
STACY VALDEZ, in her individual capacity,
TAMMY LABORDE, in her capacity, and
ACASHA KERR, in her individual capacity,

      Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

**Magistrate Judge Maritza Dominguez Braswell**

      This matter is before the Court on Plaintiff's Motion for Leave to File First Amended Complaint. ("Motion"], Doc. No. 74.) Defendants Naphcare, Inc., Kerr, and Laborde filed a Response in opposition to the Motion. (Doc. No. 79.) Defendant Valdez filed a separate Response in opposition to the Motion. (Doc. No. 78.) Plaintiff has filed a Reply. (Doc. No. 80.) After reviewing the Motion, briefing, and relevant law, the Court **RECOMMENDS** that the Motion to Amend be **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

### I.    Alleged Facts

Pueblo Police Department officers arrested Mr. Jay Phillip Pritchard on October 29,
2021. (Doc. No. 1 at ¶¶ 1; 54.) During the arrest, Mr. Pritchard sustained a fractured left femur
when he was forcefully removed from his vehicle. (*Id*. at ¶ 1.) Because he complained of
"intense pain in his hip," the officers brought Mr. Pritchard to Parkview Medical Center for
evaluation. (*Id*. at ¶ 55.) He was released into law enforcement custody later that day. (*Id*. at ¶
56.) Mr. Pritchard was taken to the Pueblo County Jail by Officer Skylar Laver, who was
involved with Mr. Pritchard's arrest and was allegedly aware of Mr. Pritchard's mental health
issues and prior suicide threat. (*Id*. at ¶ 58-59.) However, on the intake paperwork, Officer Laver
answered "no" when asked whether Mr. Pritchard had "demonstrated any behaviors which may
suggest mental illness." (*Id*. at ¶ 60.)

Mr. Pritchard, who could not walk, was then taken to booking in a wheelchair. (*Id*. at ¶
62.) During medical intake screening, he stated, "I'm only going to answer this once: I think
about suicide every day and no one helps me." (*Id*. at ¶ 63.) He refused to answer additional
questions. (*Id*.) Pueblo County Sheriff's Office ("PCSO") Deputies Austin Eccher-Salazar and
Jonathan Maestas heard this statement. (*Id*. at ¶ 63-64.) Additionally, NaphCare employee
Daniell Corpuz noted that Mr. Pritchard said he "think[s] about it everyday" and "want[s] it to be
over with"—presumably talking about suicide. (*Id*. at ¶ 65.) Mr. Pritchard was then "placed in a
cell with a concrete slab and a toilet that was several feet away," undressed, and given a suicide
smock. (*Id*. at ¶ 66.) Plaintiff alleges Mr. Pritchard was unable to walk and "was left completely
naked, sitting on the slab with the folded-up gown to his left and a blanket on his right." (*Id*. at ¶

67.) Mr. Pritchard did not use the toilet and instead relieved himself on the floor and the bench he was sitting on. (*Id.* at ¶¶ 63-70.)

The next morning, deputies helped Mr. Pritchard get dressed and shower, during which he "scream[ed] in pain." (*Id.* at ¶ 70-73.) Mr. Pritchard was then brought to Defendant Stacy Valdez for a medical assessment, which was captured on video. (*Id.* at 74.) Defendant Valdez indicated she performed several procedures and tests over the twenty-minute period, though the video allegedly reveals otherwise. (*Id.* at ¶¶ 74-81.) Plaintiff alleges the assessment was deficient and ignored risks concerning Mr. Pritchard's mental health issues. (*Id.* at ¶ 83.) Deputy Ward and another deputy then transported Mr. Pritchard to the Pueblo County Detention Facility ("PCDF") while he was "screaming in pain." (*Id.* at ¶ 86.) Nurse Practitioner Erik Renicker then attempted to conduct a psychiatric evaluation but noted that Mr. Pritchard "very clearly declined." (*Id.* at ¶ 87.)

On October 31, 2021, Defendant Acasha Kerr, a licensed clinical social worker, conducted a face-to-face assessment of Mr. Pritchard in his cell. (*Id.* at ¶ 88.) Based on her evaluation, including Mr. Pritchard's statements that he was not suicidal, she removed Mr. Prichard from suicide watch and placed him in general population. (*Id.* at ¶ 89.) The next day, Defendant Tammy Laborde, another mental health provider, evaluated Mr. Pritchard. (*Id.* at ¶ 92.) She noted Mr. Pritchard had "pressured speech and was irritable, avoidant, and tense," which Plaintiff alleges was a "clear downturn" in Mr. Pritchard's condition. (*Id.* at ¶ 92-93.) Defendant Laborde also noted Mr. Pritchard specifically stated, "I am just upset about my hip" and "I am not suicidal." (*Id.* at ¶ 93.) That evening, Defendant Deputy Wellington Duplessis gave Mr. Pritchard a corded telephone and left him unattended in his cell (*Id.* at ¶ 94.) Mr.

Pritchard then used that cord to attempt to take his own life. (*Id*. at ¶ 97.) Mr. Pritchard was taken

back to Parkview Medical Center, where he passed away from his injuries. (*Id*. at ¶ 98.) Imaging

taken at the hospital revealed Mr. Pritchard had a broken femur. (*Id*. at ¶ 99.)

## II.    Procedural History

Plaintiff initiated this case on October 23, 2023, bringing claims under the Fourteenth

Amendment, C.R.S. § 13-21-131, and a negligence theory. (*See generally* Doc. No. 1.) On

September 23, 2024, the presiding judge held oral argument on Defendants' Motions to Dismiss,

(Docs. No. 19; 20; 57). (*See* Doc. No. 69.) The Honorable Gordon P. Gallagher dismissed

several of Plaintiff's claims without prejudice.[1] (*See id*. at 59.) However, in doing so, Judge

Gallagher left open the possibility that Plaintiff might seek to amend her complaint. (*See* Doc.

No. 69 at 33:15-25 (noting it would not be appropriate to consider new facts in connection with

motions to dismiss the operative complaint, but a motion to amend may be appropriate at a later

date); *see also id.* at 60-63 (discussing amendment).) But the Court does not read Judge

Gallagher's Order as an open and unrestricted invitation for Plaintiff to start over, or to try a new

approach to the same failed claims. Judge Gallagher's Order was carefully reasoned, taking into

consideration Plaintiff's various theories and considering the effect of binding case law. Thus,

before delving into the Motion, the Court highlights two key findings in Judge Gallagher's Order

that anchor this Court's analysis.

---

[1] He expressly did not dismiss: (1) Plaintiff's § 1983 claim against Defendants Valdez, Kerr, and Laborde (hereinafter referred to as the "Individual Defendants"), to the extent those claims are premised on Defendants' alleged deliberate indifference to Mr. Pritchard's leg injury; and (2) Plaintiff's negligence claims against Defendants NaphCare, Valdez, Kerr, and Laborde. (*See* Doc. No. 69 at 60.)

*First*, Judge Gallagher rejected Plaintiff's non-straight-line theory. Relying on cases that address knowledge of intoxication as a basis for inferring suicide risk, Judge Gallagher held that Defendants' "knowledge that Mr. Pritchard was in pain, however severe that pain might have been, is not sufficient to establish that they were on notice of . . . the risk that Mr. Pritchard would commit suicide." (*Id*. at 47:18-48:9.)

*Second*, under the straight-line theory, Judge Gallagher found the operative complaint failed to satisfy the subjective prong of Plaintiff's § 1983 claim for deliberate indifference. Although the analysis for each of the Individual Defendants was slightly different, Judge Gallagher's ultimate conclusion as to each was similar—Plaintiff failed to plead sufficient facts to show an obvious risk of suicide. (*See id*. at 48:13-54:17.) Judge Gallagher relied on facts alleged in the *operative* complaint, expressly declining to consider any new facts not pleaded, and leaving open the possibility of amendment, at a later date. (*Id*. at 33:15-25.)

## III.    The Instant Motion

Plaintiff seeks to amend the complaint to bolster the allegations against the Individual Defendants, revive the dismissed § 1983 theories against the Individual Defendants, and revive the *Monell* claims against Defendants Naphcare and the County.[2] (Doc. No. 74 at 2.) Plaintiff also seeks to add a request for exemplary damages in connection with her negligence claims against the Individual Defendants. (*Id*.)

**LEGAL STANDARDS**

## I.    Federal Rule of Civil Procedure 15

---

[2] The "County" is the Board of County Commissioners of the County of Pueblo and Pueblo County Sheriff David J. Lucero. (Doc. No. 74 at 2.)

Rule 15 of the Federal Rules of Civil Procedure provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave," which should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). There is a general presumption in favor of allowing a party to amend its pleadings, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), and the non-moving party bears the burden of showing that the proposed amendment is improper. *Openwater Safety IV, LLC v. Great Lakes Ins. SE*, 435 F. Supp. 3d 1142, 1151 (D. Colo. 2020); *see also Corp. Stock Transfer, Inc. v. AE Biofuels, Inc.*, 663 F. Supp. 2d 1056, 1061 (D. Colo. 2009) (non-moving party has burden of demonstrating futility). Whether to allow amendment is within the trial court's discretion. *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978–79 (10th Cir. 1996).

## II.     Federal Rule of Civil Procedure 16

Rule 16(b) provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014) (quoting *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) (alteration in original)). This burden is satisfied when, for example, a party learns of new information through discovery, or when the governing law has changed. *Id*. "Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on

the diligence of the party seeking leave to modify the scheduling order to permit the proposed

amendment." *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000).

### III.    Exemplary Damages

Courts in this district have held that C.R.S. § 13-21-102, not Rules 15 or 16, control the

inquiry when the amendment concerns exemplary damages. *See Sands v. Integon National*

*Insurance Company*, 2020 WL 8188184 (D. Colo. Mar. 9, 2020); *Wollam v. Wright Medical*

*Group, Inc.*, No. 10-cv-3104-DME-BNB, 2012 WL 4510695, at *9 (D. Colo. Sept. 30, 2012)

(applying Colo. Rev. Stat. § 13-21-102 to motion to amend to add exemplary damages claim);

*Witt v. Condominiums at the Boulders Ass'n*, No. 04-cv-02000-MSK-OES, 2006 WL 348086, at

*7 (D. Colo. Feb. 13, 2006) (finding the court must give effect to Colorado statute in evaluating

whether exemplary damages claim properly brought in diversity action); *see also Am. Econ. Ins.*

*Co. v. William Schoolcraft, M.D., P.C.*, No. 05-cv-01870-LTB-BNB, 2007 WL 160951, at *2 (D.

Colo. Jan. 17, 2007) (applying *Jones v. Krautheim*, 208 F. Supp. 2d 1173, 1179 (D. Colo. 2002)).

Indeed, because some discovery is required before a plaintiff can seek to add a request for

exemplary damages, it would be unfair to hold a plaintiff to the ordinary amendment standards.

*See* C.R.S. § 13-21-102(1.5)(a) (provides that plaintiffs can move for exemplary damages "only

after the exchange of initial disclosures pursuant to Rule 26 of the Colorado Rules of Civil

Procedure," and only when they establish *prima facie* proof of a triable issue).

Section 13-21-102 provides that an award of exemplary damages is permissible when

"the injury complained of is attended by circumstances of fraud, malice, or willful and wanton

conduct." Colo. Rev. Stat. § 13-21-102(1)(a). "'[W]illful and wanton conduct' means conduct

purposefully committed which the actor must have realized as dangerous, done heedlessly and

recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Id*. § 13-21-102(1)(b). "Simple negligence cannot support such an award." *Blood v. Qwest Servs. Corp.*, 224 P.3d 301, 314 (Colo. App. 2009). Instead, "where a Defendant is conscious of both its conduct and the existing conditions, and knew or should have known that injury would result, the requirements of 13-21-102 are met." *Id*. The purpose of the award of punitive damages is to punish the wrongdoer, not compensate for injuries. *See Lira v. Shelter Insurance Co.*, 913 P.2d 514, 517 (Colo. 1996).

## ANALYSIS

The Court will begin with a futility analysis, first for the amendments related to the § 1983 claims against the Individual Defendants, then the amendments to revive the *Monell* claims.[3] Next, the Court will determine whether any non-futile amendment should nevertheless be precluded under Rule 15 or Rule 16. Plaintiff's request for exemplary damages will be addressed last.

## I.     Futility

### A.  § 1983 Claims Against Individual Defendants

Plaintiff seeks to bolster her § 1983 claims against Defendants Valdez, Kerr, and Laborde with new allegations. To the extent Plaintiff continues to pursue the "non-straight-line theory"—

---

[3] Although a futility analysis is often left to the end—and there are times when this Court has declined to conduct a futility analysis altogether (over concerns of infringing on the presiding judge's role)—this case is different. Here, the presiding judge has already carefully considered the viability of each claim and forecasted how an amendment may or may not cure the issues. (*See generally* Doc. No. 69.) Thus, performing a futility analysis first, is most efficient.

and it appears Plaintiff does[4]—the Court recommends the Motion be denied. Judge Gallagher expressly rejected that theory as "not cognizable as to any defendant." (Doc. No. 69 at 48:10-12.) The Court does not see anything in Judge Gallagher's Order to suggest that new *facts* can save a non-cognizable *theory*.

On the other hand, if Plaintiff seeks to pursue what Judge Gallagher described as, "a conventional straight-line theory present in jail suicide cases: An inmate had mental health issues, jail staff ignored these issues, and the inmate committed suicide," (*id.* at 45:7-11), the Court will consider those allegations. Determining whether an amendment is futile will require "a more individualized analysis" as to each of the Individual Defendants. (*See id.* at 48:11-12.)

### 1. *Defendant Valdez*

With respect to Defendant Valdez, Judge Gallagher found Plaintiff's allegations were insufficient to demonstrate an obvious risk of suicide. In so holding, Judge Gallagher observed, "the only express evidence of Mr. Pritchard's suicidal behavior was one or more statements he made to deputies, not to Defendant Valdez." (*Id.* at 48:24-49:3.) Judge Gallagher also noted that Plaintiff did not allege "Mr. Pritchard exhibited acutely suicidal behavior when meeting with Defendant Valdez or in her presence such that the need for Defendant Valdez to act would have been obvious." (*Id.* at 49:4-7.)

The question this Court must answer is whether Plaintiff's new allegations can and do cure the deficiencies identified by Judge Gallagher.

---

[4] Plaintiff criticizes Defendants' alleged overstatement of Judge Gallagher's Order and suggests Judge Gallagher contemplated an amendment that might save the non-straight-line theory. (*See* Doc. No. 80 at 9.) But it is Plaintiff that appears to be overstating Judge Gallagher's Order.

As a threshold matter, the Court observes that none of Plaintiff's new allegations suggest Defendant Valdez *directly observed* Mr. Pritchard's suicidal behavior. Thus, if Judge Gallagher intended *direct observation* as the standard, then the standard has not been met. But the Court does not read Judge Gallagher's Order as requiring that Ms. Valdez *directly observe* suicidal behavior. Instead, Judge Gallagher emphasized the lack of direct observation as further support for his conclusion that Plaintiff's allegations were simply insufficient to satisfy the subjective component of the analysis. This is because—as Judge Gallagher pointed out—*one way* of satisfying the culpable mind standard is by showing "the prisoner faces an obvious risk of harm," because "when a risk is so obvious that a reasonable person would realize it, we might well infer that the defendant did, in fact, realize it." (Doc. No. 69 at 46:16-2 (emphasis added).) However, that an "obvious risk" is one way of satisfying the subjective prong, does not foreclose the traditional approach to the subjective prong, which is to establish actual knowledge and disregard. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) ("To prevail on the subjective component, the prisoner must show that the defendants 'knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.'") (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1293 (10th Cir. 2006)); *Strain v. Regalado*, 977 F.3d 984, 990 (10th Cir. 2020) (confirming the subjective component requires that an official know of and disregard an excessive risk to inmate health or safety).

Plaintiff's new allegations concerning Defendant Valdez satisfy the standard by demonstrating actual knowledge and disregard. Plaintiff alleges:

- Defendant Valdez utilized the pre-booking triage paperwork initiated by Danielle Corpuz the night before. Defendant Valdez reviewed the question "Is the patient voicing or displaying signs of danger to self or others? If yes, insure patient safety and notify appropriate mental health staff." Defendant Valdez reviewed Mr.

Pritchard's response from the previous night, "I think about it [suicide] every day. I just want it to be over with. Don't ask me any other questions about it."

- Although Defendant Valdez was aware that she needed to notify appropriate mental health staff of that statement, she did nothing.

- Despite Defendant Valdez's knowledge of Mr. Pritchard's alarming suicidal statements the night before, she inexplicably completed a suicide risk assessment that indicated Mr. Pritchard did not have thoughts of self-harm or suicide and had not considered or attempted suicide in the past.

- Defendant Valdez made no attempt to obtain information regarding Mr. Pritchard's arrest document. The PC Affidavit was in the possession of the Pueblo County Sheriff's Department and was included in Mr. Pritchard's jail file.

- The PC Affidavit contained information directly relevant to any suicide risk assessment or mental health evaluation. Defendant Valdez had been previously trained that this information was important. Defendant Valdez had been trained that communication between correction, medical and mental health correctional staff was critical in protecting detainees. Had she attempted to obtain this document, it would have been provided to her. The information contained within the PC Affidavit mandated that Mr. Pritchard have a mental health evaluation with a suicide assessment.

- Defendant Valdez completed the Columbia Suicide Screening Form. Notwithstanding her review of Mr. Pritchard's pre-booking triage paperwork, which documented his statement of pervasive suicidal thoughts, Defendant Valdez falsely stated that Mr. Pritchard had not experienced any actual thoughts of killing himself over the previous month. She knew this was untrue based on the previous statements made to NaphCare personnel thirteen (13) hours previously and because Mr. Pritchard was on suicide watch. Because of Defendant Valdez's false responses, Mr. Pritchard was not given mental health evaluation with a suicide risk assessment.

- Apart from Defendant Valdez's concealment of Mr. Pritchard's acute risk of suicide, which was presumably motivated by her interest in expediting Mr. Pritchard's assessment and avoiding the completion of additional paperwork necessary to properly evaluate and address Mr. Pritchard's suicide risk through a referral to a qualified mental health provider or otherwise, she was aware that Mr. Pritchard reported his hip pain as a 10 out of 10. Yet Defendant Valdez did nothing to treat Mr. Pritchard's pain. Defendant Valdez had previously been trained that chronic or serious illness was a predisposing factor for suicide.

11

- Defendant Valdez had Mr. Pritchard digitally sign an acknowledgment and consent form roughly eighty (80) seconds after she sat down to meet with him. Defendant Valdez then applied this same signature to the bottom of each of the forms she claimed to have completed with Mr. Pritchard, ostensibly to indicate Mr. Pritchard acknowledged the statements and advisements on such forms. He did not.

(Doc. No. 74-1 at ¶¶ 102-109.) Some of these allegations are an improper attempt to revive the "non-straight-line theory," but others support the permissible straight-line theory and as noted above, satisfy the standard when drawing all reasonable inferences in favor of Plaintiff.

For example, Plaintiff alleges that Defendant Valdez knew Mr. Pritchard faced a substantial risk of harm because Defendant Valdez reviewed the pre-booking triage paperwork, and specifically, the following statement from Mr. Pritchard: "I think about it [suicide] every day. I just want it to be over with. Don't ask me any other questions about it." (Doc. No. 74-1 at ¶ 102.) Additionally, Plaintiff alleges that "[n]otwithstanding [Defendant Valdez's] review of Mr. Pritchard's pre-booking triage paperwork, which documented his statement of pervasive suicidal thoughts, Defendant Valdez falsely stated that Mr. Pritchard had not experienced any actual thoughts of killing himself over the previous month." (*Id.* at ¶ 107.) Plaintiff also alleges that Defendant Valdez had knowledge of the suicide risk "because Mr. Pritchard was on suicide watch." (*Id.*) And while being on suicide watch alone may be insufficient to allege actual knowledge, here, Plaintiff has alleged that Ms. Valdez was actually aware of Mr. Pritchard's very recent statement that he was suicidal.

Second, Plaintiff alleges that Defendant Valdez deliberately disregarded that risk. For example, Plaintiff alleges that "[d]espite Defendant Valdez's knowledge of Mr. Pritchard's alarming suicidal statements the night before, she inexplicably completed a suicide risk assessment that indicated Mr. Pritchard did not have thoughts of self-harm or suicide and had not

considered or attempted suicide in the past," (*id.* at ¶ 104), and expressly (and falsely) stated that Mr. Pritchard had not experienced thoughts of killing himself over the previous month. (*Id.* at ¶ 107.) Plaintiff also alleges that "Defendant Valdez's concealment of Mr. Pritchard's acute risk of suicide," was "motivated by her interest in expediting Mr. Pritchard's assessment and avoiding the completion of additional paperwork necessary to properly evaluate and address Mr. Pritchard's suicide risk." (*Id.* at ¶ 108.) Additionally, Plaintiff contends "Defendant Valdez had Mr. Pritchard digitally sign an acknowledgment and consent form roughly eighty (80) seconds after she sat down to meet with him," and "applied [his] signature to the bottom of each of the forms," indicating Mr. Pritchard acknowledged the statements. (*Id.* at ¶ 109.) But according to Plaintiff, Mr. Pritchard had not acknowledged the statements and advisements. (*Id.*) Plaintiff also claims that "Defendant Valdez made no attempt to obtain information regarding Mr. Pritchard's arrest document," which Defendant Valdez knew to be important, and which would have revealed that "a mental health evaluation with a suicide assessment," had been mandated for Mr. Pritchard. (*Id.* at ¶¶ 105-106.)

These new allegations change the calculus. The operative complaint does not allege that Defendant Valdez was actually aware of Mr. Pritchard's suicidal statement. (*See generally* Doc. No. 1.) And during the hearing before Judge Gallagher, Plaintiff's counsel argued two sheriffs and an intake nurse, Danielle Corpuz, witnessed the statement, but there was a dispute as to whether Defendant Valdez was aware of the statement. (*See* Doc. No. 69 at 24:1-22.) Now, Plaintiff unequivocally alleges that Defendant Valdez was aware of the suicidal statement made on intake, knew the risk of suicide was substantial (in that the statement indicated pervasive daily thoughts of suicide), and that Defendant Valdez disregarded that risk. Whether Plaintiff can

ultimately *prove* a culpable state of mind will require weighing of the evidence, credibility

determinations, and other tasks for the factfinder. At this stage—accepting Plaintiff's allegations

as true and drawing all reasonable inferences in Plaintiff's favor—the new allegations are

sufficient to plead the subjective prong and cure the deficiencies identified by Judge Gallagher.

### 2. *Defendant Kerr*

As to Defendant Kerr however, Plaintiff's proposed allegations continue to be deficient.

Judge Gallagher previously noted the allegations against Defendant Kerr were insufficient to

suggest she was "deliberately indifferent to the risk that Mr. Pritchard might commit suicide.

Indeed, Judge Gallagher noted the allegations demonstrated the *opposite* because "[P]laintiff's

specific allegations that Mr. Pritchard appeared calm and cooperative and provided reasonable

explanations for his behavior undercut her general theory that Defendant Kerr ignored an

obvious risk." (Doc. No. 69 at 51:24-52:5.)

The new allegations in the proposed amended complaint continue to contradict the theory

that Defendant Kerr was deliberately indifferent to a known risk of suicide. For example,

Plaintiff admits that "Defendant Kerr's rushed and unprepared assessment of Mr. Pritchard was

wholly inadequate and nowhere near sufficient to reliably evaluate his suicide risk." (Doc. No.

74-1 at ¶ 122.) At best, these allegations support a negligence theory, but they are not enough to

demonstrate deliberate indifference. Plaintiff also admits that "Defendant Kerr did not review

Mr. Pritchard's NaphCare chart," did not review "the Columbia Suicide Screen, Mental Health

Screen, Intake Triage Report, and Physical Screen," and did not "review the PC Affidavit for Mr.

Pritchard." (*Id.* at ¶ 118.) Plaintiff pleads these facts to demonstrate Defendant Kerr's cursory

and inadequate preparation, but they directly undercut the knowledge element of Plaintiff's deliberate indifference claim against Defendant Kerr.

### 3. *Defendant Laborde*

Like with Plaintiff's new allegations against Defendant Kerr, Plaintiff's new allegations against Defendant Laborde also do not change the calculus on the straight-line theory. Indeed, most of Plaintiff's new allegations regarding Defendant Laborde, appear to concern Plaintiff's *Monell* claim, not the individual capacity claim against Defendant Laborde. None of the Laborde allegations show Mr. Pritchard's risk of suicide was so obvious that Defendant Laborde must have known about it, nor do they support actual knowledge of a suicide risk. Instead, the allegations against Defendant Laborde seem to double down on the impermissible non-straight-line theory that Defendant Laborde failed to alert others of Mr. Pritchard's severe hip and leg pain, and that Defendant Laborde's deliberate disregard of such pain increased the risk of suicide. (*See generally id.* at ¶¶ 128-133.)

### B. *Monell* Claims

Plaintiff appears to reallege and reargue the same *Monell* theories previously rejected by Judge Gallagher, with the exception of one pivot: Plaintiff introduces a new theory premised on the severe understaffing problems and suicide risks associated with the same. (*See id.* at ¶¶ 133-134; 147, 212-215; 222.) Courts have recognized severe understaffing as a viable *Monell* theory. *See, e.g., Floyd v. Ada Cnty.*, No. 17-cv-00150-DCN, 2018 WL 3212006, at *4 (D. Idaho June 29, 2018) (denying motion to dismiss where plaintiff alleged a *Monell* claim based on understaffing); *Kendall v. Fulton Cnty., Georgia*, No. 23-cv-00416-JPB, 2024 WL 1242463, at *11 (N.D. Ga. Mar. 22, 2024) (same). But the burden associated with this theory is a heavy one.

*See Anderson v. City of Atlanta*, 778 F.2d 678, 687 (11th Cir. 1985) ("The mere understaffing, without more, is not proof of such practice, policy, or custom."). To prevail on a *Monell* claim based on understaffing, a plaintiff must show the defendant has "a policy of deliberate indifference to the risk of understaffing and that this policy caused their injuries." *Floyd*, 2018 WL 3212006, at *4 (quoting *Castillon v. Corr. Corp. of Am., Inc.*, No. 12-cv-00559-EJL, 2016 WL 3676116, at *7 (D. Idaho July 7, 2016)). Moreover, "[w]hen understaffing appears to have contributed to a violation of an inmate's . . . rights, a causal link exists between that violation and the prison's policy if officials are aware of the staffing problem but fail to take corrective action." *Id*.

Here, Plaintiff generally alleges that understaffing caused Defendants to rush medical and mental health assessments, inaccurately document patient interactions, and falsify medical records. (*See* Doc. No. 74-1 at ¶¶ 42-46; 133-134; 147, 212-215; 222.) Notably, Plaintiff is specific about the understaffing. (*Id*. at ¶¶ 46; 219 (alleging NaphCare did "not staff PCDF with nurse practitioners or physician's assistants on weekends," and that "[a]t the time of Mr. Pritchard's detainment and death, NaphCare was responsible for approximately 450-500 inmates at PCDF, but had assigned only two mental health clinicians.").) But as noted above, allegations of understaffing, without more, are insufficient to plead a *Monell* claim. Plaintiff must plead actual knowledge of, and direct indifference to, the risks of understaffing. *See Floyd*, 2018 WL 3212006, at *3. Plaintiff falls short of that. At best, Plaintiff suggests Defendants were aware of the risks because employees had resorted to falsifying forms. But even those allegations are caveated and do not directly allege actual knowledge of, or indifference to, the risks of understaffing. (*See, e.g., id.* at ¶ 212 (alleging "NaphCare knew certain of its employees had

resorted to falsifying information on assessment forms, *presumably* because of understaffing.")
(emphasis added); *id.* at ¶ 108 (alleging "Defendant Valdez's concealment of Mr. Pritchard's
acute risk of suicide . . . was *presumably* motivated by her interest in expediting Mr. Pritchard's
assessment[.]") (emphasis added).) And while Plaintiff includes some allegations concerning
NaphCare's knowledge, those allegations are conclusory with no supporting facts to demonstrate
knowledge of the risks, and a deliberate disregard of the same. (*See id.* at ¶ 147 ("NaphCare
knew it had severely understaffed PCDF to a degree rendering it impractical for its staff to
thoroughly address and document all patient observations"); *id.* ("NaphCare ratified the custom
and practice of neglecting patient care and overlooked its employees' failure to accurately
document medical evaluations . . . in the interest of operating more efficiently and
profitability."); *Cf. Duran v. Wellpath, LLC,* 2024 WL 2939167, at *9 (D. Colo. June 11, 2024)
(where the complaint specifically alleged Wellpath was "on notice that its widespread practice of
inadequately providing medical care, specifically through understaffing and significant backlogs,
was likely to result in a constitutional injury," because "Wellpath was allegedly fired for
providing 'substandard medical care that exposed detainees to risk of serious harm,' and . . . the
health provision system was so dysfunctional that the subsequent contractor stopped working
there."); *Castillon,* 2016 WL 3676116, at *10-12 (where plaintiff offered specific testimony to
show defendant was aware of understaffing and refused to address the problem).

In short, Plaintiff's new allegations are insufficient to state a claim under *Monell* and the
amendment would be futile.

## II.    FRCP 15 & 16

Having concluded that an amendment to revive *Monell* claims and dismissed theories against Defendants Kerr and Laborde would be futile, the Court moves on to perform the Rule 15 and 16 analysis on the claim against Defendant Valdez, only. *See Gorsuch*, 771 F.3d at 1242.

Plaintiff argues the relevant evidence was only recently discovered. (*See* Doc. No. 74 at 4.) But much of the discovery on which Plaintiff relies was secured several months before this Motion was filed.[5] And while it is true that Plaintiff only recently secured two pieces of evidence that appear central to her proposed amendments, that evidence primarily concerns the allegations against Defendant Kerr, not Defendant Valdez.[6]

Still, the Court does not find undue delay or undue prejudice, and there is good cause for the amendment. First, Judge Gallagher expressly contemplated amendment in his Order, and Defendant Valdez has been on notice of the possibility of amendment for some time. Second, while Defendant Valdez is correct to note that "extensive discovery," has already been completed, (Doc. No. 78 at 4), Plaintiff is not adding a new claim. Instead, Plaintiff is seeking to

---

[5] For example, Plaintiff relies on testimony from various deponents, claiming those depositions were meaningfully delayed by Defendants. But most of the depositions occurred in June and July of 2024, three-to-four months before Plaintiff filed this Motion.

[6] For example, Plaintiff's allegation that Defendant Kerr's meeting was cursory and deliberately indifferent relies on video surveillance that was produced between September 13-17, 2024. (*See* Docs. No. 74 at 7 (noting the County produced video surveillance recording for the first time on September 13 and 17, 2024); 74-2 at 29-32 (videoconference deposition of Defendant Kerr).) And the NaphCare log which contains entries reflecting each time a staff member viewed Mr. Pritchard's file, reveals Defendant Kerr did not review Mr. Pritchard's information before conducting his suicide risk assessment on October 31, 2021. (*See* Doc. No. 74 at 9.) Additionally, the video evidence contradicts Defendant Kerr's testimony that she conducted a lengthy, face-to-face assessment, instead revealing that she spoke with Mr. Pritchard for approximately two minutes while he was facing the opposite wall. (*Id*. at 7.) This evidence most directly supports Plaintiff's new allegations against Defendant Kerr. (Doc. No. 74-1 at ¶¶ 116-127.)

18

bolster an existing claim. And to the extent Defendant Valdez is prejudiced by the timing of the

amendment relative to the close of discovery, any such prejudice can be cured through deadline

extensions. Allowing Plaintiff to cure the deficiencies Judge Gallagher identified in his Order, is

in the interests of justice and consistent with the preference for resolving disputes on their merits.

*See James et al. v. Fenske*, 10-cv-02591-WJM-CBS, 2012 WL 592855 at *3 (D. Colo. Feb. 23,

2012) ("[T]he liberal standard for granting of motions for leave to amend . . . reflects the Court's

underlying policy that pleadings should enable a claim to be heard on its merits.") (citing

*Calderon v. Kan. Dep't of Soc. & Rehabilitative Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999).

For these reasons, the Court finds the Rule 15 and 16 standards satisfied.

## III.    Exemplary Damages

Finally, the Court considers Plaintiff's request to add a claim for exemplary damages in

connection with the negligence claim. Defendants NaphCare, Kerr, and Laborde do not address

Plaintiff's claim for exemplary damages in their Response. (*See* Doc. No. 79.) However,

Defendant Valdez argues this claim is futile because Plaintiff "makes only boilerplate allegations

that Defendants Valdez, Kerr, and Laborde acted 'willfull[y] and wanton[ly]'" and "fail[s] to

make a *prima facie* showing that Defendant Valdez's conduct was malicious, willful, or

wanton." (Doc. No. 78 at 9.) Defendant Valdez also argues "Plaintiff's proposed amendment[s]

are simply restatements of allegations it included in its original Complaint." (*Id*. at 11.)

Although the moving party has the burden of establishing the basis for an exemplary

damages claim, it is a low burden relative to the burden of proof at trial. *Affordify, Inc. v. Medac,*

*Inc.*, No. 19-cv-02082-CMA-NRN, 2020 WL 6290375, at *5 (D. Colo. Oct. 27, 2020)

(describing the burden on a motion to amend pursuant to § 13-21-102 as "an admittedly low

threshold"); *see also RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 3055772, at *4 (D. Colo. May 10, 2018). "At this stage of the litigation, the Court is only concerned with whether the evidence, when viewed in the light most favorable to plaintiffs, is sufficient to make out a *prima facie* case of willful and wanton behavior for the purpose of allowing plaintiffs to amend their Complaint to include exemplary damages, not whether such evidence is sufficient to defeat a motion for summary judgment or to result in a jury verdict in plaintiffs' favor." *Id*.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff has shown Defendants acted "without regard to consequences, or . . . the safety" of Plaintiff, and thus engaged in willful or wanton conduct. *See* Colo. Rev. Stat. § 13-21-102(1)(b). Plaintiff claims the newly discovered video evidence and log directly contradicts Defendant Valdez and Kerr's statements and documentation concerning their interactions with Mr. Pritchard. (Doc. No. 74 at 7.) More specifically, Plaintiff has submitted evidence demonstrating that Defendants Valdez and Kerr falsified documentation regarding their interactions with Mr. Pritchard, conducted cursory medical and mental health assessments, and failed to review Mr. Pritchard's records before meeting with him or releasing him from suicide watch. (*See* Doc. No. 74-1 at ¶¶ 243-244.) The proffered evidence is, at this stage, sufficient to allow a trier of fact to conclude that Defendants were conscious of their conduct and Mr. Pritchard's existing conditions, and knew or should have known that some injury to Mr. Pritchard would result. *Coors*, 112 P.3d at 66; *see also Schimek v. Owners Ins. Co.*, No. 16-cv-02197-PAB-STV, 2017 WL 3621833, at *4 (D. Colo. Aug. 23, 2017) (in an insurance case, finding defendant's conduct was willful and wanton where she conducted a cursory investigation of plaintiff's injuries); *White River Vill., LLP v. Fid. & Deposit Co. of Maryland*, No. 08-cv-00248-REB-MEH, 2013 WL 6168853, at *5 (D. Colo.

Nov. 25, 2013) (in a construction case, finding defendant's conduct was willful and wanton where it "ignored the problems and/or refused to fix them"). Accordingly, Plaintiff should be allowed to amend the complaint to include exemplary damages.

## CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Plaintiff's Motion to Amend (Doc. No. 74) be **GRANTED IN PART AND DENIED IN PART** as follows:

- Plaintiff's motion to amend the § 1983 claim against Defendant Valdez should be **GRANTED**, but only to the extent the claim is based on a conventional straight-line theory;

- Plaintiff's motion to amend the § 1983 claims against Defendant Kerr and Laborde should be **DENIED**;

- Plaintiff's motion to amend and essentially revive her *Monell* claims against Defendants NaphCare and the County should be **DENIED**; and

- Plaintiff's motion to assert exemplary damages against the Individual Defendants should be **GRANTED**.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will

not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 20th day of February, 2025.

BY THE COURT:

_____
Maritza Dominguez Braswell
United States Magistrate Judge