**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-02772-GPG-MDB

THE ESTATE OF JAY PHILIP PRITCHARD, by and through its
personal representative Nola Mawhinney,

Plaintiff,

v.

NAPHCARE, INC., *et al.*

Defendant(s).

---

**MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS**
**ACASHA KERR, TAMMY LABORDE, AND NAPHCARE, INC.**

---

**INTRODUCTION**

Defendants Acasha Kerr, Tammy LaBorde, and NaphCare, Inc. (collectively, the "Moving Defendants") move, pursuant to F.R.C.P. 56, for an order granting summary judgment in their favor on all claims against them. There is no genuine dispute of material fact and the Moving Defendants are entitled to judgment as a matter of law on four independent grounds. First, Plaintiff cannot establish that Kerr or LaBorde were deliberately indifferent to Mr. Pritchard's physical condition. When he arrived at the Pueblo County Detention Facility ("PCDF") on October 29, 2021, Mr. Pritchard had been evaluated and cleared by Parkview Medical Center, whose discharge instructions identified only leg edema and a shoulder sprain, made no reference to a fracture or any hip/leg injury, and did not contain any recommendation for pain medication or direction for follow-up beyond a visit to his primary care physician. Kerr, who evaluated Mr. Pritchard on October 31st, observed that he appeared to be in some discomfort, opened his cell door so he would not have to get up, and immediately reported her observations to NaphCare employee Stacy Valdez. LaBorde, who evaluated Mr. Pritchard the following day, documented his hip complaint and went directly to the nurse practitioner's office to request that he be seen. The foregoing does not support deliberate indifference. Rather, Mr. Pritchard was properly evaluated and treated upon admission.

Second, Plaintiff cannot establish that Kerr or LaBorde departed from the applicable standard of care in the mental health assessments they performed. NaphCare's forensic psychiatry expert, Dr. Bruce Cohen, opined that both clinicians asked appropriate questions, exercised appropriate clinical judgment in discontinuing suicide watch and then declining to reinstate it, and complied with the standard of care for suicide assessment in a jail setting. Plaintiff's effort to fault Kerr for not obtaining records from the Veterans' Administration or conferring with a licensed

2

psychiatrist before discontinuing suicide watch finds no support in NaphCare's Suicide Prevention and Intervention Policy or in the applicable standard of care.

Third, Plaintiff's negligence claim against NaphCare based on allegedly dangerous customs and policies is a recast version of the *Monell* theories this Court has twice rejected. The claim is conclusory, devoid of supporting facts, and fails to establish causation, a required element of any negligence claim under Colorado law.

Fourth, exemplary damages against NaphCare are not warranted. There is no evidence NaphCare authorized, approved, or ratified any willful or wanton conduct by its staff. NaphCare investigated Mr. Pritchard's death promptly and issued sixteen systemic recommendations. Retention of employees who allegedly committed isolated policy violations, without knowledge of the specific tortious facts, does not constitute ratification under Colorado law.

This Court already held that Plaintiff's "non-straight-line theory" is not cognizable against any defendant: knowledge of physical pain does not establish notice of suicide risk. Stripped of that theory, the claims against the Moving Defendant cannot survive summary judgment. This motion should be granted in full.

## PROCEDURAL HISTORY

Plaintiff commenced this action on October 23, 2023, asserting § 1983 deliberate indifference and *Monell* claims, as well as state law negligence claims, against NaphCare, Kerr, LaBorde, and Valdez. (Doc. No. 1.)

On September 23, 2024, the Court dismissed Plaintiff's *Monell* claims against NaphCare and dismissed the § 1983 claims against Kerr and LaBorde to the extent those claims were premised on deliberate indifference to the risk of suicide. (Doc. No. 65.) In doing so, the Court rejected Plaintiff's "non-straight-line theory" – that jail staff's indifference to Mr. Pritchard's leg

3

and hip pain caused his mental state to deteriorate until he took his own life – holding that "defendants' knowledge that Mr. Pritchard was in pain, however severe that pain might have been, is not sufficient to establish that they were on notice of … the risk that Mr. Pritchard would commit suicide." (Doc. No. 69, at 48.) The following claims survived: § 1983 claims against Kerr, LaBorde, and Valdez premised on deliberate indifference to Mr. Pritchard's leg injury; and negligence claims against the NaphCare Defendants.

Plaintiff sought leave to amend to revive the dismissed *Monell* and § 1983 theories. The Court denied both requests, reaffirming that the non-straight-line theory was not cognizable and that the *Monell* claims remained legally deficient. (Doc. Nos. 82, 93.) On April 17, 2026, Plaintiff filed the operative Second Amended Complaint, asserting § 1983 deliberate indifference claims against Kerr, LaBorde, and Valdez, and negligence and exemplary damages claims against the NaphCare Defendants. (Doc. No. 127.)

### STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts are relevant to two distinct claims. Facts in Section A concern Mr. Pritchard's <u>physical</u> condition and the responses of Kerr and LaBorde; these support Defendants' motion on Plaintiff's §1983 deliberate indifference claim, which is premised solely on an alleged delay in treating hip pain. Facts in Section B concern the suicide risk assessments by Kerr and LaBorde; these support Defendants' motion on Plaintiff's state law negligence claims. The Court has already made clear that these theories are legally distinct: awareness of physical pain does not establish notice of suicide risk.

### A. Mr. Pritchard's Physical Condition and Medical Treatment.

1.    On Friday, October 29, 2021, Jay Pritchard was arrested by the Pueblo County Police Department and charged with criminal mischief, reckless driving (he attempted to evade the police

4

by speeding away from the scene, nearly colliding with several vehicles), bias motivated crimes (threatening the owner of the hotel where he was living, telling him that he doesn't belong here and that he should go back to where he came from (Korea)), and resisting arrest. *(Exhibit G (Sheriff Report), at page 1.)*

2.      After being tased and tackled to the ground by the police, he was brought to Parkview Medical Center ("Parkview"), where he was seen by physicians who cleared him for admission to PCDF. *(Exhibit A (NaphCare records) at 144.)*

3.      The only recommended treatment was for Mr. Pritchard to follow up with his primary care physician this week and to "return for new/worse". (*Id*.)

4.      There was no recommendation for pain medication; nor was there any indication that Mr. Pritchard received – or even requested – pain medication while at Parkview. The discharge instructions were for leg edema and shoulder sprain. *(Id., at 129-143.)*

5.      At 6:15 a.m. on October 30th, Valdez placed the first of her two requests for Mr. Pritchard to be seen by a medical provider, noting, "Post force [follow up]. Post hospital return. Happened prior to booking. [Bilateral lower edema]." *(Exhibit C (sick call detail).)*

6.      Valdez had just come on duty and wanted to "make sure he got seen as soon as possible." (Exhibit B, at 85:20-22). She also placed the request because the patient had been seen (and cleared) by the hospital prior to booking, and "it's standard. Once somebody is sent to the hospital and comes back, they have to see a provider." *(Id., at 85:6-13.)*

7.      At 10:18 a.m. Valdez put in a second sick call request, noting "[bilateral lower extremity edema]. Possible cellulitis, [history of diabetes mellitus], refuses medications. [Follow up] hospital." *(Exhibit C.)*

8. She then completed a Receiving Screening, documenting that Mr. Pritchard: suffered from hypertension, PVD (peripheral vascular disease), and diabetes; had been hospitalized for eight (8) days in December 2020 for spleen removal and in January for blood clots; had bilateral lower extremity edema, an ulceration to his left leg, and impaired mobility; and complained of left hip pain with decreased range of motion and that had been cleared from Parkview prior to intake. *(Exhibit A, at 122-26.)*

9. She noted that he stated that he is "unable to move [left] leg [due] to hip pain [related to] arrest." *(Id., at 117-21.)*

10. At 10:53 a.m., in response to Valdez's second sick call request, NP Orozco noted that the patient presented with "[bilateral lower extremity] edema/possible cellulitis. [History of diabetes mellitus]-refuses medication; prior Hospital clearance prior to booking." *(Exhibit A, at 103-107.)*

11. She documented that the patient had a history of hypertension and diabetes; that she reviewed the patient's ER summary (*i.e.*, hospital clearance from Parkview), which diagnosed unspecified leg edema and shoulder sprain, and did not order any new medications. *(Id., at 106-107.)*

12. She also documented that he was to follow up with "onsite provider for further [evaluation] and patient education regarding medication needed for disease processes (regarding [patient] does not want to take any [medications.]" *(Id.)*

13. After Kerr performed her mental health evaluation of Mr. Pritchard, (discussed in detail below) she advised Valdez that he was still complaining of pain. *(Exhibit D (Kerr Dep.), at 49:22-50:2.)*

14. Valdez stated that they would continue to monitor him and reiterated that he had been medically cleared by Parkview *(Id., at 50:6-8.)*

15. After being cleared from suicide precautions, Mr. Pritchard was moved to Med Cell #4 due to mobility issues. *(Exhibit G, at 1.)*

16.     After meeting with Mr. Pritchard on November 1st, LaBorde went to the nurse practitioner's office and explained that he was very upset about his hip and would like to see someone in medical about it. *(Exhibit E (LaBorde Dep.), at 59:8-12.)*

**B. Suicide Risk Assessments by NaphCare Mental Health Staff.**

17.     During the pre-booking process at PCDF, at approximately 9:30 p.m. on October 29th, Mr. Pritchard stated that he thinks about suicide "every day." *(Exhibit A, at 101.)*

18.     He also stated, "Don't ask me any other questions about it." (*Id*.)

19.     He was placed on suicide precautions. *(Id.)*

20.     Throughout the night, he was noted to be aggressive and uncooperative with detention staff, screaming, cursing, and repeatedly hurling racial epithets, homophobic slurs, and other hate speech at detention staff, and refusing efforts to assist him. *(Exhibit H (Detention Reports), at 1, 2, 3, 4, and 5.)*

21.     Because of Mr. Pritchard's aggressive and intoxicated condition during the pre-booking process,[1] the night nurse was unable to complete the Pre-Booking Triage Form, so Valdez completed the form when she interviewed the patient at 10:28 a.m. the next morning. *(Exhibit B, at 46:11-17.)*

22.     Although she noted that he was not currently having suicidal ideations, Valdez kept him on suicide precautions. *(Exhibit A, at 101).*

23.     At 6:16 a.m. on October 30th, NaphCare employee Candace Brandenburg MHP (mental health professional) prepared a "Suicide Note", documenting that "Pritchard made suicidal threats

---

[1] Mr. Pritchard, a long-time drug user, tested positive for both methamphetamines and THC on November 1st. *(Exhibit A, at 43.)*

to Medical during the intake screening [the previous night]. He will be placed on suicidal precautions and housed in Transportation Holding Cell #2." *(Exhibit A, at 157-162.)*

24.    Nurse Valdez completed a Mental Health Screening, noting that he was currently feeling depressed (1-3 out of 10), but that he was not currently having thoughts of self-harm or suicide. *(Id., at 146-150.)*

25.    She completed the Columbia Suicide Screening Form noting that he denied any suicidal thoughts, and documenting "no" to whether, over the past month, he has wished he was dead or wished he could go to sleep and not wake up or had any actual thoughts of killing himself; and whether, over his lifetime, he has ever done anything, started to do anything, or prepared to do anything to end his life. *(Exhibit A, at 108-109.)*

26.    At 8:03 p.m. that night, NaphCare Psych NP Eric Renicker documented that he attempted several times to perform a psychiatric evaluation to follow up on Mr. Pritchard's statement during intake, but that the patient "clearly declined." *(Id.*, at 165).

27.    At approximately 9:25 a.m. on October 31st, Kerr, a mental health professional, evaluated Mr. Pritchard. *(Exhibit A, at 151-56.)*

28.    Kerr was "outside of the med cell, he was laying down on the bench inside the med cell." *(Id., at 33:4-5).*

29.    Because she was having difficulty hearing him through the door to the cell, she asked him to get up and come to the door so she could better assess and hear him. *(Id., at 33:8-9, 14-16.)*

30.    She could see that he was struggling to get up from the bench, so she asked the deputy to open the door, so he did not have to get up to speak with her. *(Id.*, at 17-20).

31.    Based on the way he was struggling to get up, as well as his facial expression, he appeared to be in pain. *(Id.*, at 33:22-34:1.)

32.    She asked him how he was doing; he responded that he was okay, that "he was never suicidal, that he was angry, he was pissed off at the deputies because they were chasing him and he didn't want to go to jail, and he emphatically stated that over and over again." *(Id., at 34:19-24.)*

33.    He was able to provide coping skills of "talking with family, socializing, staying busy, and was future oriented; he talked about an upcoming appointment that he needed to make because he needed additional resources and he needed to make that meeting so that he could get those resources." *(Id, at 35:1-6).*

34.    He denied that he was taking any mental health medications or receiving any mental health services. *(Id., at 58:20-22.)*

35.    At 10:33 a.m. Kerr prepared a Suicide Watch Discontinuation, noting that he was assessed face to face at his cell door at approximately 9:25 a.m. and stated 'I am not suicidal, I am just tired, the cops were chasing me, I just needed to calm down and realize I am ok' and that he denied "any suicidal ideation, plan, or intent." *(Exhibit A, at 151-56.)*

36.    The plan was to discontinue suicide watch and to place him in general population, where he was to be "monitored by custody" and reevaluated by mental health within 24 hours. *(Id.)*

37.    He was educated on the kite system for any future mental health needs or concerns. *(Id.)*

38.    At 1:56 p.m. on November 1st, LaBorde, a mental health professional, completed a 24-Hour Post-Release From Suicide Watch Note. *(Id., at 93-8.)*

39.    She noted that she met with Mr. Pritchard at approximately 1:40 p.m. and that he stated that he is "just upset about my hip. I am in pain and no one is doing anything about it. I need a doctor. I think I broke my hip and I have broken so many bones before. I am not suicidal." *(Id.)*

9

40. She documented "clear communication" under behavior; "full range" under affect; "oriented to person" and "oriented to place" under cognition; "intact" under judgment; "pressured" under speech; and "irritable" under mood. *(Id.)*

41. She noted that he was having no sleeping or eating difficulties, that he does not endorse any suicidal or homicidal ideation, is in no acute distress, agreed to inform staff immediately if he begins having suicidal ideation, and verbalized understanding of the kite process, which was reviewed with him. (*Id.*)

42. That evening, at approximately 7:34 p.m., after former defendant Deputy Duplessis brought him a phone with a long cord, Mr. Pritchard spoke on the phone to his sister, Nola Mawhinney, for several minutes. *(Exhibit F (Transcript of Plaintiff deposition), at 28:12-13.)*

43. His profanity-laced diatribe did not include any complaint of pain or an expression of suicidal ideation. *(Id.)*

44. At 7:50 p.m., detention staff found Mr. Pritchard unresponsive with telephone cord wrapped around his neck hanging from the half privacy wall and bench in his cell. *(Exhibit A, at 12-14, 28-30, 32.)*

45. A code was called and CPR was initiated with return of spontaneous circulation. (*Id.*).

46. He was brought to Parkview but never regained consciousness. (*Id.*)

47. A CTA of the abdomen/pelvis revealed a "mildly displaced fracture of the left femoral neck." (*Id.*, at NaphCare 57).

48. On November 4th, Mr. Pritchard died from his self-inflicted injuries.

## LEGAL ARGUMENT

I.    LEGAL STANDARD

10

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ.P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To state a Fourteenth Amendment claim, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). Plaintiff must satisfy "both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Under the objective component, the alleged deprivation must be "sufficiently serious" to constitute a deprivation of constitutional dimension. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In other words, the plaintiff must show that the medical need has been diagnosed by a physician as mandating treatment or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

The subjective component requires the prison official to disregard the risk of harm claimed by the prisoner. *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009). Importantly, a plaintiff must show that the prison "official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. at 842; *Berry v. City of Muskogee, Okl.*, 900 F.2d 1489, 1498 (10th Cir. 1990) (deliberate indifference requires "actual knowledge of the specific risk of harm"). Stated another way, the defendant must have known that the plaintiff "faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate

11

it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotations omitted). This subjective standard is the equivalent of criminal recklessness, not mere negligence. *See e.g.*, *Farmer*, 511 U.S. at 836–37.

A medical professional's alleged negligent failure to provide adequate medical care does not constitute unnecessary and wanton infliction of pain and therefore does not give rise to a constitutional violation. *Self*, 439 F.3d at 1230. "Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems." *Grant v. Bernalillo County Det. Ctr.*, 173 F.3d 863 (10th Cir. 1999) (unpublished). Under Tenth Circuit law "a delay in medical treatment for a serious medical need does not violate a prisoner's constitutional rights unless the prisoner can show that the delay resulted in "substantial harm." *See Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir.1993).

Furthermore, where, as here, an inmate refuses medical treatment offered to him (Mr. Pritchard refused several requests by a NaphCare provider to conduct a psychiatric evaluation on October 30th) and did not request any medical treatment (Mr. Pritchard did not request pain medication from anyone and refused all medications offered to him), there is no deliberate indifference. *See Johnson v. Davis Cnty.,* No. 1:18-CV-00080-DBB, 2021 WL 615325, at *13 (D. Utah Feb. 17, 2021), aff'd, No. 21-4030, 2022 WL 830202 (10th Cir. Mar. 21, 2022) (summary judgment granted on deliberate indifference because plaintiff denied medical treatment offered to him, did not request any medical treatment, and told the nurse that he "just wanted to sleep"); *see also Rachel v. Troutt*, 718 F. App'x 642, 645 (10th Cir. 2017) (no deliberate indifference where inmate did not complain of pain or ask to see a doctor).

## II.    PLAINTIFF HAS FAILED TO ESTABLISH THAT KERR OR LABORDE WERE DELIBERATELY INDIFFERENT TO A SERIOUS MEDICAL NEED

Plaintiff alleges that Kerr was deliberately indifferent in "failing to treat or escalate the physical care for Mr. Pritchard's untreated and undiagnosed pain." (Complaint, at ¶ 188.) Similarly, Plaintiff alleges that LaBorde was deliberately indifferent in failing to "treat or refer Mr. Pritchard for further medical evaluation to treat Mr. Pritchard's intense pain." (Complaint, at ¶ 189).

As to the objective element of a deliberate indifference claim, it is undisputed that when Mr. Pritchard arrived at PCDF on October 29th a physician had not diagnosed Mr. Pritchard as requiring treatment for a hip fracture or pain. Rather, he was medically cleared by Parkview to be transferred to the Facility. The only recommended treatment was for Mr. Pritchard to follow up with his primary care physician this week and to "return for new/worse". There was no recommendation for pain medication; nor was there any indication that Mr. Pritchard received – or even requested – pain medication while at Parkview. The discharge instructions were for leg edema and shoulder sprain. There was no documentation provided by Parkview to NaphCare to suggest that Mr. Pritchard had suffered a serious leg or hip injury (or any leg or hip injury) or that he had any complaint of pain. Thus, Plaintiff has failed to show that hip or leg pain was diagnosed by a physician as mandating treatment. Plaintiff must therefore demonstrate that Mr. Pritchard's medical need "was so obvious that even a layperson would easily recognize the necessity for a doctor's attention."

It is undisputed that Mr. Pritchard did not request pain medication from either Kerr or Laborde – or anyone else at PCDF for that matter.[2] Although Kerr observed that he was in pain and LaBorde documented his complaint of pain, both noted that he was otherwise calm.

---

[2] As his sister testified, Mr. Pritchard frequently refused to take pain medication because he believed it was ineffective. (Exhibit F, at 24:25-25:3, 29:7-9.) His medical records are replete with refusals of pain medication and recommended treatments.

It is important to note that the record is devoid of any evidence that detention staff ever advised Kerr or LaBorde that Mr. Pritchard had complained that he was unable to walk due to hip pain or that he had urinated and defecated on himself during his first night in custody. This is one of many examples in which Plaintiff attempts to impute to NaphCare information known only to detention staff and which was not shared with the medical staff. The Tenth Circuit has made clear that the subjective component is an <u>individualized</u> inquiry; that is, each defendant must personally know of, and consciously disregard, an excessive risk to inmate health or safety. *See Jensen v. Garden*, 752 F. App'x 620, 624 (10th Cir. 2018) (no deliberate indifference where no evidence that physician and physician's assistant were informed of any of the inmate's medical needs – serious or otherwise – at the time he was injured).

Under the circumstances, it certainly cannot be said that Mr. Pritchard's medical need "was so obvious that even a layperson would easily recognize the necessity for a doctor's attention."

Even assuming, *arguendo*, that Plaintiff has satisfied the objective element of a deliberate indifference claim against Kerr and LaBorde, Plaintiff has failed to establish that either acted or failed to act despite knowledge of a substantial risk of serious harm. Mr. Pritchard did not even complain to Kerr of hip/leg pain. Rather, she observed that he was struggling to get up from the bench he was lying on and that his facial expression suggested that he was in pain. In response, she asked the deputy to open the door to his cell so that she could speak to him and he did not have to get up. This is the opposite of deliberate indifference. She recognized that he was in pain and responded with compassion. She took "reasonable measures to abate" his pain by not asking him to get up and walk over to her. Notably, during her assessment, he did not complain of pain, ask for pain medication, or request a medical evaluation. Still, based on her own observations, Kerr reported to Valdez that he still appeared to be in pain. Valdez stated that they would continue to

14

monitor him and reiterated that he had been medically cleared by Parkview. Kerr's affirmative act forecloses any finding of deliberate indifference. The subjective component requires proof that the official "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. at 842. Kerr did the opposite; she acted on what she observed and ensured Mr. Pritchard's complaint reached the appropriate medical personnel.

On November 1st, LaBorde documented that Mr. Pritchard complained of hip pain and wanted to be seen by Medical. Again, he did not request any pain medication. LaBorde immediately reported his complaint and request to a nurse practitioner.

In sum, Plaintiff has failed to establish that Kerr or LaBorde acted or failed to act despite knowledge of a substantial risk of serious harm. That they did not offer pain medication – which Mr. Pritchard never requested – does not constitute unnecessary and wanton infliction of pain and therefore does not give rise to a constitutional violation. There is no evidence that Mr. Pritchard faced a life-threatening situation because of his leg/hip pain or that a delay would exacerbate his medical problems. Dismissal of the deliberate indifference claims against Kerr and LaBorde is warranted and should be granted.

Furthermore, because Plaintiff has failed to establish that Kerr or LaBorde were deliberately indifferent or perceived that they were violating Mr. Pritchard's federal rights, exemplary damages are not warranted against them.

### III.    PLAINTIFF HAS FAILED TO ESTABLISH ANY DEPARTURE FROM THE STANDARD OF CARE BY KERR OR LABORDE

#### A.   Colorado Law Requires Expert Testimony Establishing Both a Departure from the Standard of Care and Causation.

The negligence claims against Kerr and LaBorde arise solely from their suicide risk assessments. Specifically, that Kerr should not have discontinued Mr. Pritchard from suicide watch on October 31st, and that LaBorde should have reinstated it on November 1st. These claims have

15

nothing to do with Mr. Pritchard's hip pain. As this Court has already held, awareness of physical pain does not establish notice of suicide risk, and the two theories are legally distinct. The question here is whether Kerr and LaBorde departed from the applicable standard of care in their clinical judgment about suicide risk – and the answer is no.

It is axiomatic that to prevail in a medical malpractice action, a plaintiff must establish that the defendant departed from the applicable standard of care and that his damages were proximately caused by the defendant's negligence. Expert testimony is required and the evidence must be based on more than mere speculation, conjecture, or surmise. *See Self*, 439 F.3d at 1230 (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10 Cir. 2004)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun*, 956 F.2d 949, 951 n. 3 (10th Cir.1992); accord *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir.2004) (noting that "unsupported conclusory allegations ... do not create a genuine issue of fact") (internal citation and quotation marks omitted).

Importantly, Colorado law is clear that a healthcare provider's policies do not set the standard of care. *See Cook v. Whyde*, No. 20-CV-02912-PAB-STV, 2021 WL 4459051, at *13 (D. Colo. Sept. 29, 2021) (quoting *Wood v. Rowland*, 592 P.2d 1332, 1335 (Colo. App. 1978) ("What a hospital may require of its nurses has little, if anything, to do with the obligations that specialized training and experience may impose on nurses in the community."); *see also Tracz ex rel. Tracz v. Charter Centennial Peaks Behav. Health Sys., Inc.*, 9 P.3d 1168, 1173–74 (Colo. App. 2000) (rejecting plaintiff's argument that jury could find negligence based on failure to comply with company policy because existence of policy does not obviate necessity for expert testimony). Thus, Plaintiff cannot establish the standard of care, or a departure from it, simply by pointing to NaphCare's Suicide Prevention and Intervention Policy. She must present competent expert

testimony establishing what a reasonably careful mental health professional would have done under the circumstances, and that Kerr and LaBorde fell short of that standard.

### B. Kerr's Mental Health Assessment Was Clinically Appropriate and Complied with the Standard of Care.

Plaintiff's claim that Kerr was negligent in discontinuing Mr. Pritchard's suicide watch status "without completing a comprehensive suicide risk evaluation or conferring with a licensed qualified mental health professional" is without merit as there is no evidence that NaphCare's Suicide Prevention and Intervention Policy (Exhibit I) or the applicable standard of care required such an evaluation. NaphCare's Forensic Psychiatry Expert, Bruce J. Cohen, M.D., opined that during their mental health assessments, Kerr and LaBorde "asked appropriate questions and exercised appropriate clinical judgment in their decision to discontinue suicide watch and in their decision 24-hours post-watch to have him remain off of suicide watch with as-needed mental health follow up….Their actions complied with the applicable standard of care for suicide assessment in the jail setting." (Exhibit K, at 17).

It is clear from Kerr's notes that she had ample time to identify the pertinent clinical details and suicide risk factors to make an informed clinical judgment that suicide watch could be discontinued. That Kerr, an experienced mental health professional,[3] left several boxes unchecked on the record she completed is of no consequence, particularly considering the level of detail included in her summary of the encounter. Moreover, there is no evidence from Kerr's evaluation that "Mr. Pritchard lacked the decision-making capacity to make decisions about his mental health needs or to be capable of contacting the mental health service." (Exhibit K, at 19).

---

[3] At the time of the events at issue, Kerr had been performing mental health assessments for over seven (7) years. (Exhibit D, at 11:7 to 12:23).

Tellingly, Plaintiff and her purported expert mischaracterize and exaggerate the record evidence while improperly conflating the information known to NaphCare as a healthcare provider with information known by law enforcement and detention personnel in an effort to suggest that NaphCare ignored or failed to consider important information in caring for Mr. Pritchard, when in fact the information had not been provided to NaphCare staff. As multiple NaphCare witnesses confirmed, they do not have access to an inmate's arrest records or information concerning the circumstances of the arrest, unless the information is communicated to them by law enforcement or detention staff or they specifically request it. Indeed, Dr. Cohen testified that his experience working in several correctional settings has been that such records are not available to medical staff. (Exhibit K, at 18.)  Correctional healthcare staff do not need detailed information regarding the circumstances of an inmate's arrest because their role is to treat patients, not to investigate or assess criminal conduct. Moreover, requiring medical providers to know the underlying allegations against an inmate risks improperly influencing clinical judgment with non-medical considerations. Although communication and coordination between medical and custody staff is important and there is necessarily some operational overlap, custody and healthcare personnel serve distinct functions within the detention setting, each with separate responsibilities and objectives.

### C. Kerr Was Not Required to Obtain Outside Records Before Discontinuing Suicide Watch.

Additionally, since it is undisputed that Mr. Pritchard denied having previously received mental health treatment or having taken mental health medications, and denied any current suicidal ideation, it was appropriate for Kerr not to obtain collateral medical or pharmacy records. Plaintiff ignores the fact that correctional healthcare providers are tasked with addressing inmates' acute and immediate medical needs and, like emergency department providers, are not required to

18

possess a patient's complete medical history before rendering appropriate care.[4] Because Mr. Pritchard never expressed a specific plan to take his own life to anyone at NaphCare, he was considered a non-acutely suicidal patient, per NaphCare's detailed Suicide Prevention and Intervention Policy. (Exhibit I, at 8(b)).

Even if Kerr had obtained and reviewed those records (which was not possible), the information contained therein would not have changed the ultimate course of treatment for Mr. Pritchard. The thousands of pages of medical records disclosed in this case (including over 1000 pages from the Veterans Administration) are devoid of any reference to a prior suicide attempt or a hospitalization for suicidal ideation or mental illness. Thus, it is entirely speculative to suggest, as Plaintiff's purported expert does, that 1) records from a huge governmental agency like the VA could have been obtained immediately; and, more important, 2) that in the extremely unlikely event that NaphCare staff had obtained Mr. Pritchard's records from the VA on Sunday, October 31st, that he would not have been discontinued from suicide watch that day. (Exhibit K, at 19). As Dr. Cohen opined, "[o]ne would not maintain an inmate on suicide watch solely because one was waiting on outside records." (Id.) Moreover, if Kerr had obtained the VA records:

> it would have confirmed that when upset Mr. Pritchard did tend to make statements about wanting to kill himself and/or others but that he did not have a history of past suicide attempts. The records would [also] have confirmed Mr. Pritchard's self-report of currently being unhoused but of his having been working with the VA and affiliated veteran's support agencies to obtain new housing. (Id.)

In short, Kerr's assessment was clinically sound and fully compliant with the applicable standard of care.

### D. LaBorde's Assessment Was Reasonable, as Mr. Pritchard Consistently Denied Suicidal Ideation.

---

[4] Indeed, as NaphCare's corporate representative (Ms. Hassim) confirmed, NaphCare does not require obtaining collateral information such as prior treatment records, and it is "not a hundred percent feasible with the carceral setting" to obtain such records. (Exhibit L, at 84:17-24, 85:13-15.)

As to LaBorde, Plaintiff's exaggerated allegation (at ¶ 207 of Doc. No. 127) that she failed to recognize Mr. Pritchard's "declining psychological condition indicative of a mental health crisis" is entirely contradicted by the record evidence, which establishes that:

> While he remained upset about his current *medical* condition and pain, he otherwise was cooperative, demonstrated a full range of affect, was oriented, communicated clearly, and had intact insight. He again denied having any mental health history or any history of suicide attempts. Consistent with his report the day before to Ms. Kerr, he indicated that he had made the previous suicidal statement when he was angry, upset, and in pain, but he denied having any current suicidal ideation. (Exhibit K, at 19 (emphasis added).)

As Dr. Cohen opined, it "was reasonable for Ms. LaBorde to have kept Mr. Pritchard off of suicide watch and to have provided further education about how Mr. Pritchard could report any mental health concerns or suicidal ideation to security, the medical staff, or the mental health staff and he could put in a sick call request for additional mental health services." (*Id.*)

In short, after expressing suicidal ideations when he was first booked into the jail (when he was on drugs and was clearly angry about being chased and tackled by the police), Mr. Pritchard "consistently denied having current suicidal ideation, active intent, or past suicide attempts. He also offered a reasonable explanation for why he initially had made such statements and he did appear to be future-oriented and to have supports in the community." (*Id*., at 20). It is undisputed that the only time Mr. Pritchard expressed any suicidal ideation to anyone while at PCDF was during the pre-booking process on October 29th. Also, undisputed is that he never expressed a specific plan to commit suicide to anyone at NaphCare.

It bears emphasis that both Kerr and LaBorde were evaluating Mr. Pritchard specifically for suicide risk, and not for his physical condition, which was the responsibility of the medical staff. The fact that Mr. Pritchard was complaining of hip pain during one of the evaluations (he never voiced a complained of hip/leg pain to Kerr) does not mean that either clinician was required

20

to act on that complaint; it was documented and escalated to the appropriate medical personnel. Plaintiff cannot bootstrap the physical pain allegations into the negligence claim by suggesting that untreated pain was itself a suicide risk factor, as the Court has already rejected that theory as legally insufficient.

In sum, Plaintiff has failed to establish any departure from the standard of care by Kerr or LaBorde. But even if she could, her negligence claims would still fail for lack of causation, an independent and equally fatal deficiency. Colorado law requires proof that but for the defendant's alleged negligence, the plaintiff's injury would not have occurred. *Kaiser Found. Health Plan of Colo. v. Sharp*, 741 P.2d 714, 719 (Colo. 1987). Plaintiff cannot meet that standard here. Mr. Pritchard denied suicidal ideation to both Kerr and LaBorde, denied any mental health history, expressed future orientation, and identified support systems. As Dr. Cohen opined, placing an individual who denies current psychiatric symptoms on suicide watch could itself fall below the standard of care. (Exhibit K, at 20.) There is no evidence – and certainly none sufficient to survive summary judgment – that a different clinical judgment by either Kerr or LaBorde on October 31st or November 1st would have prevented Mr. Pritchard from taking his own life that evening after speaking with his sister. The causation element is entirely speculative, and speculation is insufficient under Colorado law. *See Kaiser*, 741 P.2d at 719.

## IV. PLAINTIFF'S NEGLIGENCE CLAIM AGAINST NAPHCARE IS A RECAST *MONELL* CLAIM AND FAILS FOR LACK OF EVIDENCE AND CAUSATION

This Court has twice rejected Plaintiff's *Monell* theories that NaphCare had "dangerous customs and policies." Plaintiff now alleges, in her negligence claim (¶¶ 204-221 of Doc. No. 127), that NaphCare had a custom and practice of  1) "prioritizing efficiency and economy over the quality of patient care and safety"; 2) "cutting corners to leverage the limited number of qualified mental health professionals it hires to serve inmates across various understaffed facilities,

21

including PCDF"; 3) "ignoring the medical needs of inmates, disregarding even obvious pain and suffering and refusing to transport obviously injured inmates like Mr. Pritchard to the hospital"; and 4) ignoring its own suicide prevention policy.

However, Plaintiff's allegations of negligent custom and practice are entirely conclusory and devoid of supporting facts. Plaintiff has elicited no evidence of any of the above-referenced policies. Nor has plaintiff established a causal link with the supposed policies, instead alleging, for example, in conclusory fashion, that the policy of prioritizing efficiency over the quality of patient care "enabled" Kerr to discontinue Mr. Pritchard's suicide watch status without completing a "comprehensive" suicide risk evaluation. There is certainly no evidence that *but for* alleged understaffing at the Facility, Mr. Pritchard would not have taken his own life, a required element of a negligence claim under Colorado law. *Kaiser Found. Health Plan of Colo. v. Sharp*, 741 P.2d at 719; *see also Reigel v. SavaSeniorCare LLC*, 292 P.3d 977 (Colo. App. 2011) (district court erred in ruling that plaintiff was only required to present evidence that alleged negligence increased plaintiff's risk of death or deprived him of a significant chance to avoid death); *Lorenzen v. Pinnacol Assurance*, 557 P.3d 100, 105 (Colo. App. 2019) ("but-for standard consistently applied by our supreme court").

Simply put, not only has Plaintiff failed to establish that NaphCare had any negligent custom and practice, but she has also failed to establish causation beyond mere possibility or speculation, which is clearly insufficient to withstand summary judgment under Colorado law. *See Kaiser*, 741 P.2d at 719.[5] The same is true of Plaintiff's conclusory allegations of inadequate education, training, and supervision.

---

[5] That causation as to policy is purely and improperly speculative is clear from Plaintiff's allegation (at ¶ 220 of Doc. No. 127) that a nurse's falsifying information on a medical record was "presumably" because of understaffing.

V.    **PLAINTIFF'S CLAIM FOR EXEMPLARY DAMAGES AGAINST NAPHCARE SHOULD BE DISMISSED BECAUSE THERE IS NO EVIDENCE THAT IT RATIFIED ANY WILLFUL OR WANTON CONDUCT BY ITS EMPLOYEES.**

To be entitled to recover exemplary damages, a plaintiff must demonstrate "fraud, malice, or willful and wanton conduct". C.R.S. § 13-21-102(1)(a). Willful and wanton conduct is "conduct which an actor realizes is highly hazardous and poses a strong probability of injury to another but nevertheless knowingly and voluntarily chooses to engage in." *Lahey v. Covington*, 964 F. Supp. 1440, 1446 (D. Colo. 1996), aff'd sub nom. *Lahey v. Twin Lakes Expeditions, Inc.*, 113 F.3d 1246 (10th Cir. 1997). "Conduct which is merely negligent cannot serve as the basis for exemplary damages." *Frick v. Abell*, 602 P.2d 852, 854 (Colo. 1979). Instead, "the act causing the injuries must be done with an evil intent and with the purpose of injuring the plaintiff, or with such a wanton and reckless disregard of his rights as evidence a wrongful motive." *Id.*, at 854 (quoting *Ress v. Rediess*, 278 P.2d 183, 187 (Colo. 1954)).

A principal such as NaphCare "cannot be held liable in exemplary damages for the act of an agent unless it is shown that it: (a) authorized or approved the servant's tortious act; or (b) approved of or participated in the act; or (c) failed to exercise proper care in the selection of its servant." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1174 (10th Cir. 1981) (quoting *Holland Furnace Co. v. Robson*, 402 P.2d 628, 631 (Colo. 1965)); *see also* Restatement, (Second), Agency § 217C. Plaintiff does not allege that NaphCare participated in the allegedly tortious act or that it failed to exercise proper care in the selection of its servant. The sole basis for the claim is Plaintiff's contention that by not disciplining Valdez or Kerr for alleged violations of NaphCare policy, NaphCare ratified the conduct. However, "for ratification or approval to occur on vicarious liability, the principal must have knowledge of the facts." *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1264 (10th Cir. 1995) (citing Restatement

23

(Second) of Torts § 909, comments (a) & (b)). Additionally, there must be some conduct indicating assent to those known facts. *Id*. (citing Restatement (Second) of Agency § 217C comment (b)).

Notably, retention in employment is <u>not</u> conclusive of ratification of an employee's conduct. *Frick v. Abell*, 602 P.2d 852, 856 (Colo. 1979); *see also McCafferty v. Preiss Enters., Inc.,* 2012 WL 128952023, at *10 (D. Wyo. Apr. 26, 2012) (employer did not ratify employee's actions despite not terminating, and indeed ultimately promoting, the employee); *Campen v. Stone*, 635 P.2d 1121, 1126 (Wyo. 1981) (relying on § 217C to conclude that the fact that employer did not fire or discipline employee did not constitute ratification); *Fitzgerald*, 68 F.3d at 1264 (employer who conducted investigation and reached a conclusion as to employee conduct could not be charged with knowledge of tortious facts based on litigation outcome years later).

First, as discussed above (at Point II), Plaintiff has failed to establish any willful or wanton conduct by Kerr or LaBorde as to Mr. Pritchard's hip pain.[6] Plaintiff's allegations that Valdez and Kerr violated NaphCare policy are insufficient because policy violations do not establish willful or wanton conduct. *Hinrichsen v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 1:24-CV-02103-DDD-MDB, 2025 WL 3242395, at *3 (D. Colo. Oct. 29, 2025). There is no evidence that NaphCare received or had access to information concerning the circumstances surrounding Mr. Pritchard's arrest or his prior treatment records. Nor is NaphCare required by policy to obtain such information.

In addition, the record is devoid of any evidence that NaphCare authorized or approved the acts for which exemplary damages are now claimed – several isolated violations of NaphCare policy by non-managerial employees – or that NaphCare was even aware of the allegedly tortious conduct at the time of the events at issue, a requisite element of the ratification argument Plaintiff

---

[6] As to Valdez, NaphCare adopts and incorporates by reference all arguments set forth in Valdez's motion for summary judgment.

advances. NaphCare investigated the circumstances of Mr. Pritchard's death immediately after it happened and the review resulted in sixteen (16) systemic recommendations. (Exhibit M). NaphCare's actions reflect a good-faith institutional response and certainly cannot be characterized as assent to tortious behavior. The facts known to NaphCare are that the review did not recommend disciplining any NaphCare employees, and that there may have been several isolated policy violations by NaphCare staff. The ratification doctrine requires that the principal have knowledge of the specific tortious facts and then manifest assent to them. *Fitzgerald, supra.* Such knowledge and assent are nonexistent based on the current record. Plaintiff's barebones assertion of "egregious misconduct" as to Valdez and Kerr is merely a litigation label and not a conclusion that NaphCare reached or adopted. The fact that one of NaphCare's 30(b)(6) witnesses testified that Valdez should have been disciplined but could not explain why she was not does not establish willful and wanton corporate conduct – at best, it reflects an administrative oversight or supervisory failure. The allegation regarding Valdez's falsification of medical records – which, by itself does not support an inference of deliberate indifference – also fails under the ratification theory. *See Lindwurn v. Wexford Health Sources*, 84 F. App'x 46, 48 (10th Cir. 2003) (unpublished). There is no evidence NaphCare knew of the falsification until years after the lawsuit was filed, and because the review did not find that there had been a falsification of records, there is no evidence that NaphCare assented to the conduct.

Furthermore, the fact that a corporate representative (Ms. Hassim) testified that she was "surprised" about the brevity of Ms. Kerr's assessment and found certain conduct "misleading" does not establish that NaphCare knew at the time the events occurred that Kerr acted with willful and wanton disregard in proving care to Mr. Pritchard. Rather, it merely indicates that a corporate representative who reviewed the record through the lens of litigation and reached negative

assessments of certain employee conduct. This is precisely the circumstance *Fitzgerald* addressed and NaphCare cannot be charged with knowledge of the allegedly tortious character of its employees' conduct based on conclusions reached during litigation years after the fact.

In sum, the record is devoid of any evidence of "willful or wanton conduct" or "evil intent" by NaphCare in not disciplining its employees. Nor is there any basis for attributing to NaphCare the several isolated policy violations. *See Solis v. Dick's Sporting Goods, Inc.*, No. 23-CV-01119-GPG-NRN, 2024 WL 3951024, at *4 (D. Colo. Aug. 27, 2024) (no basis for attributing isolated incident of inadequate testing to employer).

Plaintiff has therefore failed to satisfy Colorado's strict test for corporate exemplary damages liability. Such damages are not warranted against NaphCare.

## CONCLUSION

For the foregoing reasons, the Moving Defendants respectfully request that this Court grant summary judgment in their favor on all claims.

26

This 25th day of June, 2026.

Respectfully submitted,

/s/ Katherine W. Dandy
Brenda S. McClearn
Katherine W. Dandy
HALL BOOTH SMITH, P.C.
5445 DTC Parkway, Suite 900
Greenwood Village, CO 80111
bmcclearn@hallboothsmith.com
kdandy@hallboothsmith.com

*Attorneys for Acasha Kerr, Tammy LaBorde, and NaphCare, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that on this 25th day of June, 2026, I electronically transmitted the foregoing document to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ James Muse
James Muse, Paralegal

27