IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 23-cv-02772-GPG-MDB

THE ESTATE OF JAY PHILIP PRITCHARD, by and through his personal representative Nola Mawhinney,

Plaintiff,

v.

NAPHCARE, INC., an Alabama Corporation;
STACY VALDEZ, in her individual capacity;
TAMMY LABORDE, in her individual capacity; and
ACASHA KERR, in her individual capacity,

Defendants.

---

**ORDER**

---

Before the Court are Defendant Stacy Valdez's Motion for Summary Judgment (D. 133) and Motion for Summary Judgment on Behalf of Defendants Acasha Kerr, Tammy LaBorde, and NaphCare, Inc (D. 139). The Court GRANTS IN PART Stacy Valdez's Motion and DENIES Kerr, LaBorde, and NaphCare's motion for the following reasons.

## I. UNDISPUTED FACTS

This civil action arises from the medical care and death of Jay Prtichard while he was in custody at Pueblo County Detention Facility (PCDF).[1] On Friday, October 29, 2021, Pritchard

[1] The Court draws the operative facts from Defendant Kerr, LaBorde, and NaphCare's Statement of Undisputed Material Facts (D. 139 at 4–10). Defendant Valdez incorporates all of the facts found in her Co-Defendants' motion into her motion (D. 133 at 3). The Court finds the following facts undisputed for the purposes of deciding the motion. In places, the Court has added context to the undisputed facts for clarity and readability. Where it does so, the Court cites directly to Mr. Pritchard's medical records included at D. 139-1. Relevant information supported by admissible

was arrested by the Pueblo County Police Department[2] and brought to Parkview Medical Center (Parkview), where he was seen by physicians who cleared him for admission to PCDF (D. 139 at ¶¶ 1–2). The discharge instructions were for leg edema and shoulder sprain (*id.* at ¶ 4). The only recommended treatment for Mr. Pritchard was to follow up with a primary care physician "this week" and to "return for new/worse" (*id.* at ¶ 3). Mr. Pritchard was taken to PCDF that evening (D. 139-7 at 1).

During the pre-booking process at PCDF, at approximately 9:30 p.m. on October 29th, Mr. Pritchard stated to a night nurse that he thinks about suicide "every day" (D. 139 at ¶¶ 17–18). He also said, "don't ask me any other questions about it" (*id.*). The night nurse noted these comments on the Pre-Booking Triage Form, but she did not complete the form (*see* D. 133 at ¶ 5; D. 136 at ¶ 5). Mr. Pritchard was then placed on suicide precautions (D. 139 at ¶ 19). Throughout the night, he was noted to be aggressive and uncooperative with detention staff and refused efforts of assistance (*id.* at ¶ 20).[3] At 6:15 a.m. the next morning, October 30th, Candace Brandenburg, a mental health professional employed by NaphCare, prepared a "Suicide Note," documenting that "Pritchard

---

evidence from Plaintiff's Statement of Additional Disputed Facts (D. 145 at 6–9) is discussed in the Analysis section below.

[2] Plaintiff disputes this and other statements contained in the cited document (D. 139-7) as inadmissible hearsay (D. 145 at ¶ 1). The Court finds these statements fall into the Rule 803(8)(A)(iii) exception for public records because the cited document is "[a] record or statement of a public office"—the Pueblo County Sheriff's Office—that sets out "factual findings from a legally authorized investigation."

[3] Plaintiff disputes this statement as inadmissible hearsay (D. 145 at ¶ 20). The Court finds this statement falls into the Rule 803(8)(A)(ii) exception for public records because the cited documents (D. 139-8) are "record[s] or statement[s] of a public office"—the Pueblo County Sheriff's Office—that sets out "a matter observed while under a legal duty to report."

made suicidal threats to Medical during the intake screening [the previous night]. He will be placed on suicidal precautions and housed in Transportation Holding Cell #2" (*id.* at ¶ 23).

At the same time, Defendant Stacy Valdez, a nurse employed by Defendant NaphCare, Inc., placed a request for Mr. Pritchard to be seen by a medical provider, noting, "[p]ost force [follow up]. Post hospital return. Happened prior to booking. [Bilateral lower edema]" (*id.* at ¶ 5). At 10:18 a.m., Valdez put in a second request, noting "[bilateral lower extremity edema]. Possible cellulitis, [history of diabetes mellitus], refuses medications. [Follow up] hospital" (*id.* at ¶ 7). She completed a Receiving Screening, noting that Mr. Pritchard stated that he was "unable to move [left] leg [due] to hip pain [related to] arrest" (*id.* at ¶ 9). She then completed a Mental Health Screening, noting that Mr. Pritchard was currently feeling depressed (1–3 out of 10) but that he was not having thoughts of self-harm or suicide (*id.* at ¶ 24; D. 139-1 at 108).[4] She also completed the Columbia Suicide Screening Form, noting that he denied any past or present suicidal thoughts (D. 139 at ¶ 25).[5] Finally, Valdez completed the Pre-Booking Triage Form (*id.* at ¶ 21).

At 10:53 a.m., Gabriela Orozco, a nurse practitioner employed by NaphCare, conducted an Intake Assessment and noted that Mr. Pritchard presented with "[bilateral lower extremity] edema/possible cellulitis. [History of diabetes mellitus]-refuses medication; prior Hospital clearance prior to booking" (*id.* at ¶ 10; D. 139-1 at 103).[6] She documented that he had a history

[4] Plaintiff does not dispute the contents of Valdez's notes from the Mental Health Screening but does dispute that the screening was performed accurately and violated NaphCare policy (D. 145 at ¶ 24).

[5] Plaintiff also does not dispute the contents of Valdez's notes from the Columbia Suicide Screening Form but does dispute that the screening was performed accurately and violated NaphCare policy (D. 145 at ¶ 25).

[6] Plaintiff disputes this and several other statements made by providers in Pritchard's medical records as inadmissible hearsay under Federal Rul of Civil Procedure 56(c)(4). The Court finds that these statements fall into the Rule 803(4) exception for medical diagnosis or treatment because they (A) were made for medical diagnosis or treatment and (B) describe medical history, past or present symptoms or sensations, their inception, or their general cause.

of hypertension and diabetes and that she reviewed his hospital clearance summary from Parkview (D. 139 at ¶ 11). Orozco also documented that Mr. Pritchard was to follow up with an onsite provider for further evaluation and education (*id.* at ¶ 12). At 8:03 p.m. that night, Eric Renicker, a psychiatric nurse practitioner employed by NaphCare, documented that Mr. Prtichard attempted several times to perform a psychiatric evaluation to follow up on Mr. Pritchard's statement during intake, but that Mr. Pritchard "clearly declined." (*id.* at ¶ 26).

At approximately 9:25 a.m. the following morning, October 31st, Defendant Acasha Kerr, a mental health professional employed by NaphCare, evaluated Mr. Pritchard (*id.* at ¶ 27). Kerr was "outside of the med cell, he was laying down on the bench inside the med cell" (*id.* at ¶ 28). Because she was having difficulty hearing him, Kerr asked Mr. Pritchard to get up and come to the door so she could better assess and hear him (*id.* at ¶ 29). She could see that he was struggling to get up from the bench, so she asked the deputy to open the door so that Mr. Pritchard did not have to get up to speak with her (*id.* at ¶ 30). Based on the way Mr. Pritchard was struggling to get up, as well as his facial expression, she noted that he appeared to be in pain (*id.* at ¶ 31). Kerr asked him how he was doing, to which he responded that he was okay, that "he was never suicidal, that he was angry, he was pissed off at the deputies because they were chasing him and he didn't want to go to jail" (*id.* at ¶ 32).[7] Mr. Pritchard was able to provide coping skills of "talking with family, socializing, staying busy, and was future oriented; he talked about an upcoming appointment that he needed to make because he needed additional resources and he needed to make that meeting so that he could get those resources" (*id.* at ¶ 33). He denied that he was taking

[7] For this and the following four statements, Plaintiff disputes that Kerr assessed Mr. Pritchard "face to face at his cell door" and argue that "the interaction of less than two minutes was insufficient to conduct an in-depth assessment" (D. 145 at ¶¶ 32–36); however, Plaintiff does not dispute the contents of Kerr's statements, her interaction with Pritchard, or her Suicide Watch Discontinuation.

any mental health medications or receiving any mental health services (*id.* at ¶ 34). At 10:33 a.m., Kerr prepared a Suicide Watch Discontinuation, noting that Mr. Pritchard was assessed face to face at his cell door and stated, "I am not suicidal, I am just tired, the cops were chasing me, I just needed to calm down and realize I am ok" and that he denied "any suicidal ideation, plan, or intent" (*id.* at ¶ 35). Kerr cleared Pritchard from suicide precautions, after which he was moved to med cell #4 due to mobility issues (D. 139 at ¶ 15; D. 139-1 at 153).

At 1:56 p.m. the next day, November 1st, Defendant Tammy LaBorde, a mental health professional employed by NaphCare, completed a 24-Hour Post-Release From Suicide Watch Note for Mr. Pritchard (D. 139 at ¶ 38). LaBorde noted that she met with Mr. Pritchard at approximately 1:40 p.m. and that he stated that he is "just upset about my hip. I am in pain and no one is doing anything about it. I need a doctor. I think I broke my hip and I have broken so many bones before. I am not suicidal" (*id.* at ¶ 39). She documented "clear communication" under behavior; "full range" under affect; "oriented to person" and "oriented to place" under cognition; "intact" under judgment; "pressured" under speech; and "irritable" under mood (*id.* at ¶ 40). She noted that he was having no sleeping or eating difficulties, that he did not endorse any suicidal or homicidal ideation, was in no acute distress, agreed to inform staff immediately if he began having suicidal ideation, and verbalized understanding of the kite process, which was reviewed with him (*id.* at ¶ 41).

That evening, at approximately 7:34 p.m., after Deputy Wellington Duplessis brought him a phone with a long cord, Mr. Pritchard spoke on the phone with his sister, Plaintiff Nola Mawhinney, for several minutes (*id.* at ¶ 42). At 7:50 p.m., detention staff found Mr. Pritchard unresponsive hanging from the half privacy wall and bench in his cell with the telephone cord

wrapped around his neck (*id.* at ¶ 44). A code one was called, and CPR was initiated with return of spontaneous circulation (*id.* at ¶ 45; D. 139-1 at 12–15, 29). Mr. Pritchard was brought to Parkview but never regained consciousness (D. 139 at ¶ 46). A computer tomography angiography (CTA) of his abdomen/pelvis revealed a "mildly displaced fracture of the left femoral neck" (*id.* at ¶ 47). On November 4th, Mr. Pritchard died from his self-inflicted injuries (*id.* at ¶ 48).

Plaintiff brings a 14th Amendment inadequate medical care claim against Valdez, LaBorde, and Kerr and a state law negligence claim against NaphCare, LaBorde, Kerr, and Valdez (D. 127). All Defendants move for summary judgment on all claims (D. 133; D. 139).

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider the factual record and reasonable inferences based on said record "in the light most favorable to the non-moving party." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* If the moving party meets this burden, the opposing party must go beyond the pleadings and designate evidence showing there is a genuine triable issue. *Celotex*, 477 U.S. at 323–24. Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial." *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

## III. ANALYSIS

### A. Fourteenth Amendment

Plaintiff claims Kerr and LaBorde provided Mr. Pritchard with inadequate medical care because they were deliberately indifferent toward his hip injury (D. 127 at ¶¶ 188–189). Plaintiff claims Valdez provided inadequate medical care because she was deliberately indifferent to both Mr. Pritchard's hip injury and mental health crisis (*id.* at ¶ 187).

The Fourteenth Amendment entitles pretrial detainees to custodial medical care. *See Paugh v. Uintah Cnty.,* 47 F.4th 1139, 1153 (10th Cir. 2022). To establish a violation of this right, a plaintiff must show that (1) they had a serious medical need, and (2) the defendant was deliberately indifferent to that serious medical need. *Id.* A medical need is considered sufficiently serious for the purposes of the Fourteenth Amendment if it "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hardy v. Rabie*, 147 F.4th 1156, 1164 (10th Cir. Aug. 4, 2025) (citations omitted).

In order for an official to have been deliberately indifferent to a plaintiff's serious medical need, the official must have known that the plaintiff "faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Hardy,* 147 F.4th at 1163 (quoting *Callahan v. Poppell,* 471 F.3d 1155, 1159 (10th Cir. 2006)). To establish that a defendant

knew the plaintiff faced a substantial risk of harm, a plaintiff must show that the defendant was aware of facts from which an inference could be drawn that there was a substantial risk of serious harm and that the defendant drew that inference. *Id.* at 1165 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). Alternatively, a plaintiff may establish a defendant's awareness of a risk of serious harm by "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005) ("[I]f a risk is obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it.") (citation omitted); *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023) ("When a risk is obvious, it is circumstantial evidence of an official's awareness of serious medical need.").

To establish that the defendant disregarded that risk, a plaintiff can either show that the defendant failed to properly treat plaintiff's serious medical need or acted as a gatekeeper who prevented plaintiff from receiving treatment or denied access to someone capable of evaluating plaintiff's need for treatment. *See Lucas,* 58 F.4th at 1137 (citing *Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000)). Either way, "doing nothing in the face of serious medical needs is obviously sufficient to state a claim . . . However, merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability." *Lucas*, 58 F.4th at 1139.

Under the failure to properly treat theory, the Tenth Circuit has recognized deliberate indifference where "a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition, completely denies care although presented with recognizable symptoms which potentially create a medical emergency, or responds to an obvious risk with treatment that is patently unreasonable." *Paugh,* 47 F.4th at 1154 (quoting *Self v. Crum,*

439 F.3d 1227, 1232 (10th Cir. 2006) (internal quotation marks omitted)). Treatment that is patently unreasonable includes attempting to treat significant symptoms with over-the-counter medications and remedies. *See, e.g. Oxendine v. Kaplan,* 241 F.3d 1272, 1278-1279 (10th Cir. 2001) (doctor ordered daily infirmary visits and was aware of plaintiff's gangrenous black hand tissue for two weeks, yet only prescribed Tylenol with codeine); *Lucas,* 58 F.4th at 1142 (plaintiff was treated with Tylenol for Leukocytosis, E. coli, and ongoing vaginal discharge); *Smith v. Allbaugh*, 987 F.3d 905 (10th Cir. 2021) (medical staff treated patient's severe abdominal pain with Pepto-Bismol, a laxative, Ibuprofen, and fibrous foods). However, mere disagreement over a chosen course of treatment does not constitute deliberate indifference, and inmates do not have a right to a particular course of treatment. *Lucas,* 58 F.4th at 1137 ("A claim that a course of treatment was inadequate after the exercise of medical judgment, absent an extraordinary degree of neglect, [] does not rise to disregard of serious medical need (citing *Self*, 439 F.3d at 1232, 1234)); *Callahan*, 471 F.3d at 1160 (rejecting the contention that the Eighth Amendment guaranteed a right to a particular course of treatment).

Under the gatekeeper theory, a defendant's failure to report a plaintiff's symptoms to a qualified provider or provide a reference to a qualified provider constitutes deliberate indifference. *See, e.g. Hardy,* 147 F.4th 1166 (official who saw emergency distress button go off from a cell multiple times and failed to act); *Est. of Jensen by Jensen v. Clyde,* 989 F.3d 848, 860 (10th Cir. 2021) (jail nurse provided Gatorade instead of referring a patient for serious stomach problems). *But see Crowson v. Washington Cnty. State of Utah,* 938 F.3d at 1166, 1180 (finding no deliberate indifference where nurse left a notation for referral in a patient's file).

*1. Kerr and LaBorde*

Kerr and LaBorde argue that Mr. Pritchard did not have an objectively serious medical need, and they were not deliberately indifferent to his medical need. Plaintiff has established a genuine dispute as to whether Mr. Pritchard's hip injury was an objectively serious medical need and whether Kerr and Laborde were deliberately indifferent to that need.

While it is undisputed that Mr. Pritchard did not have a diagnosis by a physician for his alleged hip injury, it is also undisputed that the CTA of his abdomen/pelvis at Parkview on November 1st revealed that he had a mildly displaced fracture of the left femoral neck. As it is further undisputed that Mr. Pritchard had reported hip pain several times since his arrival at PCDF on the 29th, and there is no evidence suggesting that the femur fracture occurred after Mr. Pritchard left PCDF, it is likely that he suffered the injury prior to entering PCDF. A fractured bone is a medical need so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *See Clemmons v. Bohannon*, 956 F.2d 1523, 1527 (10th Cir. 1992) (listing cases).

Viewing the evidence in a light most favorable to Plaintiff, Kerr saw that Mr. Pritchard struggled to get up and walk in his cell and specifically recognized that he appeared to be in pain. A reasonable jury could conclude that Kerr knew that Mr. Pritchard faced a substantial risk of harm based on this information. Kerr testified that she then told Valdez that Mr. Pritchard was in pain, but Valdez has not admitted such a conversation occurred, and there is no documentation that Kerr told anyone else of Mr. Pritchard's pain. Therefore, a reasonable jury could also find that Kerr failed in her role as gatekeeper to report Mr. Pritchard's symptoms to a qualified provider or provide a reference to a qualified provider. Similarly, a reasonable jury could find that LaBorde knew Mr. Pritchard was in pain because it is undisputed that he told her he broke his hip and was

in pain. Like Kerr, LaBorde testified that she asked nurse practitioner Wendy Batchelor to evaluate Mr. Pritchard's pain, but Batchelor had no recollection of such a conversation (D. 145-2 at 32–34). Therefore, a reasonably jury could find that LaBorde failed in her role as gatekeeper as well.

*2. Valdez*

Valdez also argues that Mr. Pritchard's hip injury was not an objectively serious medical need, and she was not deliberately indifferent to his injury. As already discussed above, Mr. Pritchard's hip injury was an objectively serious medical need. However, unlike with Kerr and LaBorde, Plaintiff cannot show that Valdez was deliberately indifferent to his hip injury. It is undisputed that Valdez did not have the authority to enter orders for medications, and she put in two requests for Mr. Pritchard to be seen by medical providers. Therefore, there is no dispute that Valdez did not fail to treat Mr. Pritchard's pain or to provide a referral for treatment of his hip pain, and no reasonable jury could find for Plaintiff on this basis.

Plaintiff can show that Valdez was deliberately indifferent to the extent her claim is premised on Valdez's failure to provide a referral for mental health treatment. Neither Valdez nor Plaintiff argues or briefs whether Mr. Pritchard's mental state presented an objectively serious medical need. Rather, Valdez's motion focuses on the deliberate indifference element. A reasonable jury could find that Valdez was deliberately indifferent to Mr. Pritchard's mental health needs by failing to refer him for a mental health evaluation. It is undisputed that she kept Mr. Pritchard on suicide watch (even if she lacked the authority to remove him), but she did not enter a referral for a mental health appointment despite seeing on the Pre-Booking Triage form that he

said he thinks about suicide every day.[8] Therefore, there is evidence that Valdez failed to report Mr. Pritchard's symptoms to a qualified provider or provide a reference to a qualified provider.

**B. Negligence**

Plaintiff claims that all Defendants were negligent in their provision of medical care to Mr. Pritchard, resulting in "harm and death" (D. 127 at ¶¶ 228–229). While the specific "harm" referred to is not made explicit, the Complaint generally discusses Mr. Pritchard's hip injury and untreated pain. To succeed on a medical malpractice action in Colorado, a plaintiff "must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury." *Day v. Johnson*, 255 P.3d 1064, 1069 (Colo. 2011) (en banc). To establish a breach of the duty of care, a plaintiff "must show that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by the defendant." *Id.* "[E]xpert testimony is normally required as evidence of the standard of care in medical malpractice cases." *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 929–30 (Colo. 1997), *as modified on denial of reh'g* (Oct. 20, 1997). To prove causation, a plaintiff "must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's negligent conduct." *Kaiser Found. Health Plan of Colorado v. Sharp*, 741 P.2d 714, 719 (Colo. 1987).

*1. Kerr and LaBorde*

Kerr and LaBorde argue that Plaintiff cannot establish that they breached the duty of care. Plaintiff has established there is a genuine dispute of fact precluding summary judgment for both

[8] It is undisputed that the night nurse, not Valdez, made this note on the Pre-Booking Triage form (D. 133 at ¶ 5; D. 136 at ¶ 5). It is also undisputed that Valdez completed the form (D. 133 at ¶ 3; D. 136 at ¶ 3).

defendants. Plaintiff's expert Dr. Robert Canning's report indicates that the standard of care for a mental health professional in a correctional facility requires a full suicide risk evaluation, documentation of risk stratification and a risk mitigation plan, and a "face-to-face evaluation of the patient" before releasing an individual from suicide precaution status (D. 145-2 at 123–124). Dr. Canning also wrote that "[a] qualified mental health clinician must be proactive in seeking out information about recent or remote suicidality and mental health treatment, conduct a thorough interview of the individual including a suicide inquiry and a review of both static and dynamic risk and protective factors" (*id.* at 125). Plaintiff has presented evidence that Kerr did not review Mr. Pritchard's clinical record before discontinuing his suicide watch despite having access to his NaphCare chart, which included mental health and medical notes (D. 145 at ¶¶ 64, 76). There is no evidence in the record—nor does Kerr argue—that she conducted a full suicide risk evaluation or reviewed Mr. Pritchard's risk factors. Although Kerr presents expert testimony from Dr. Bruce Cohen, that her actions "complied with the applicable standard of care for suicide assessment in the jail setting" (D. 139-11 at 17), a reasonable jury could find that she failed to conform to the appropriate standard of care based on the competing expert evaluations.

Plaintiff's expert Dr. Lori Roscoe's report indicates that LaBorde failed to adhere to the standard of care by not reporting or documenting Mr. Pritchard's hip pain. As discussed above, there is a dispute of fact as to whether LaBorde reported Pritchard's pain to Batchelor. Regardless, Dr. Roscoe states that if LaBorde reported Mr. Pritchard's pain to Batchelor, then her "failure to document it in the health record significantly deviated from the applicable standard of care" (D. 145-2 at 82). Dr. Roscoe also states that if LaBorde did not report to Batchelor, "then her failure to notify a medical staff member who could evaluate and address Mr. Pritchard's serious

pain and concerning inability to walk significantly deviated from the applicable standard of care" (*id.*). LaBorde does not present evidence that she did adhere to the appropriate standard of care, instead arguing that she was "evaluating Mr. Pritchard specifically for suicide risk, and not for his physical condition, which was the responsibility of the medical staff" (D. 139 at 20). Based on this evidence, a reasonable jury could find that she failed to conform to the appropriate standard of care and caused Pritchard's hip pain to go untreated.

*2. Valdez*

Valdez argues that Plaintiff cannot establish that her actions caused Mr. Pritchard's untreated pain or suicide. Valdez is entitled to summary judgment because Plaintiff cannot establish that her actions were a but-for cause of either injury. Again, it is undisputed that Valdez did not have the authority to enter orders for medications, and she put in two requests for Mr. Pritchard to be seen by providers. Therefore, the evidence suggests that Valdez did all that she was authorized to do in regard to Mr. Pritchard's hip pain, and even without her assessment or if another nurse practitioner completed the assessment, Mr. Pritchard's hip pain would still have gone untreated. Second, despite Valdez's failure to enter a referral for mental health treatment, it is undisputed that Mr. Pritchard was seen (or attempted to be seen) by three separate mental health professionals before he attempted suicide in his cell, including one on the same day that Valdez saw Mr. Pritchard. Therefore, even if Valdez had entered a referral for a mental health evaluation, the evidence indicates that Mr. Pritchard would have faced the same outcome.

*3. NaphCare*

NaphCare's sole argument for summary judgment is that Plaintiffs' negligence claim is a "recast *Monell* claim," and the Court has already twice rejected Plaintiff's *Monell* theories for lack

of evidence of a custom or policy (D. 139 at 21–22). However, Plaintiff's negligence claim against NaphCare is premised on both direct and vicarious liability (D. 127 at ¶¶ 224–225). Therefore, even if NaphCare was entitled to summary judgment on the direct liability theory (alleging NaphCare had deficient policies), it has not briefed the vicarious liability theory (alleging clinical failures of its employees), and summary judgment must be denied.

NaphCare also argues that "Plaintiff's claim for exemplary damages against NaphCare should be dismissed because there is no evidence that it ratified any willful or wanton conduct by its employees" (D. 139 at 23). A plaintiff may recover exemplary damages where "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." C.R.S. § 13-21-102(1)(a). "'[W]illful and wanton conduct' means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S. § 13-21-102(1)(b). Under Colorado law, a "principal cannot be held liable in exemplary damages for the act of an agent, unless it is shown that it authorized or approved the act for which exemplary damages are claimed; or, that it approved of or participated in the wrong of its agent; or, that it failed to exercise proper care in selecting its servants." *Holland Furnace Co. v. Robson,* 402 P.2d 628, 631 (Colo. 1965). Plaintiff here claims that NaphCare authorized or approved of Kerr, LaBorde, and Valdez's willful and wanton conduct (D. 127 at ¶ 224).

NaphCare relies on its argument that Kerr, Labore, and Valdez did not engage in negligent conduct at all to argue that "Plaintiff has failed to establish any willful or wanton conduct . . . as to Mr. Pritchard's hip pain" (D. 139 at 24). As discussed above, Plaintiff has established there are issues of fact with regard to Kerr and LaBorde's alleged negligence. Therefore, there remains a

question whether Kerr and Labore's conduct was willful or wanton. Plaintiff has also established there is a question of fact as to whether NaphCare approved or authorized Kerr and LaBorde's conduct, most notably because NaphCare failed to discipline Kerr and LaBorde and retained them as employees. "The fact that a master retains a servant, after gaining knowledge of the servant's malicious or wanton conduct, is evidence which can tend to prove ratification of the servant's acts." *Frick v. Abell,* 602 P.2d 852, 856 (Colo. 1979). As NaphCare acknowledged, "retention in employment is not conclusive of ratification of an employee's conduct" (D. 139 at 24). However, at the summary judgment stage, a plaintiff need not show that it is conclusively entitled to exemplary damages, only that a reasonable jury could find that it is entitled to exemplary damages. As such, NaphCare is not entitled to summary judgment on this issue.

## IV. CONCLUSION

Accordingly, Defendant Stacy Valdez's Motion for Summary Judgment (D. 133) is GRANTED as to the 14th Amendment claim to the extent it is based on Mr. Pritchard's hip injury and as to the negligence claim and DENIED as to the 14th Amendment claim to the extent it is based on Mr. Pritchard's mental health. The Motion for Summary Judgment on Behalf of Defendants Acasha Kerr, Tammy LaBorde, and NaphCare, Inc (D. 139) is DENIED in full.

DATED September 9, 2026.

BY THE COURT:

Gordon P. Gallagher
United States District Judge